IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No. 33693-0-III |
| Kh.V.-B. | ) | (consolidated with |
| ———————————————————— | ) | No. 33694-8-III) |
| | ) | |
| In the Matter of the Parental Rights to | ) | |
| | ) | UNPUBLISHED OPINION |
| Ka.V.-B. | ) | |

SIDDOWAY, J. — After an 18-month dependency and a three-day trial, the trial

court entered an order terminating the appellant mother's parental rights to her twin

daughters, Kh.V.-B. and Ka.V.-B. She appeals the order, arguing that the record does not

support several of the court's findings. We find substantial support for the court's

findings in the record and affirm.

FACTS AND PROCEDURAL BACKGROUND

At issue in this proceeding are the appellant mother's parental rights to her two

youngest children, twin girls born on July 3 and 4, 2013.[1] The twin girls were born

prematurely and, upon delivery, tested positive for Percocet (for which the mother at

times had a prescription) and marijuana. They were classified as medically fragile.

Because the twins struggled to gain weight, feeding tubes had to be surgically inserted

above their navels and they remained in a Spokane hospital for two months.

As time for release of the girls neared, hospital staff became concerned about

releasing them to their mother because she had failed to attend their medical

appointments or learn how to care for their needs. The mother lived in Moses Lake and

had largely declined the opportunity to room-in at the hospital or at a nearby Ronald

McDonald House. On August 22, 2013, hospital staff made a report of neglect to the

Department of Social and Health Services (DSHS) based on their concern. DSHS filed a

dependency petition on August 26. The twins were placed with a foster mother upon

their release from the hospital.

The twins were found dependent three months later, on December 10. DSHS

identified the mother's primary parental deficiencies at that time as substance abuse,

---

[1] The appellant has two older children who live with their father. Kh.V.-B. and Ka.V.-B. were fathered by a different man, whose parental rights the Department of Social and Health Services also petitioned to terminate; he relinquished his parental rights on the second day of the termination trial.

mental health issues, a history of relationships with domestic violence perpetrators, and a lack of understanding of the medical care the twins would require. To address these deficiencies, DSHS offered the following services: "a psychological evaluation, a parent/family bonding assessment, a mental health intake and treatment along with case management services, substance abuse evaluation and substance abuse treatment, random urinalysis testing and domestic violence classes." Clerk's Papers (CP) at 93.

For many months into the dependency, the girls' doctors deemed them too fragile for scheduled visitation, so the mother's only opportunity for visitation was at medical appointments. The mother was unable to attend all the medical appointments because many occurred on an emergency basis. Regular visitation began in September 2014.

<u>Services Provided</u>

*Mental Health Services*

At the beginning of the dependency, DSHS referred the mother to Jennifer Van Wey, a clinical psychologist, for a neuropsychological evaluation. An appointment was scheduled for February 20, 2014, but the mother did not attend. At around the same time, the mother was referred for counseling to Sherri Dowse, a mental health professional with Grant Mental Healthcare. Ms. Dowse treated the mother from February 2014 to April 2015. Although the mother missed about one third of her scheduled appointments

3

with Ms. Dowse (as far as Ms. Dowse could tell from the information available to her), Ms. Dowse described the mother as making significant progress when she was there.

DSHS referred the mother for a neuropsychological exam a second time in the summer of 2014, and Dr. Van Wey conducted the evaluation on September 24 and 25. She diagnosed the mother with an adjustment disorder, chronic anxiety and depression, a cognitive disorder with verbal comprehension deficits, cannabis and opioid abuse, and a personality disorder not otherwise specified with histrionic and avoidance features.

The nature of the mother's cognitive disorder is difficulty comprehending verbal instruction. According to Dr. Van Wey, the mother is unable to retain large amounts of verbal information and needs instructions to be broken down into steps and written down, or better yet, provided in picture form. Based on what Dr. Van Wey described as a "constellation of difficulties hindering the mother's ability to parent," the doctor recommended an intensive course of treatment, concluding that "[w]eekly long-term psychotherapy with a skilled provider who is comfortable treating the complex interplay of personality disorder, anxiety, low verbal intelligence, and substance abuse history, behavioral modification strategies would be ideal." CP at 94; Report of Proceedings (RP) at 154.

Ms. Dowse reviewed Dr. Van Wey's report on the mother and incorporated its findings into her counseling. She responded to the mother's difficulty with verbal

4

comprehension by using a dry erase board and role play in the counseling sessions. Ms. Dowse believed she was able to take the information provided by Dr. Van Wey and develop an effective strategy to work on the mother's issues.

At the time Ms. Dowse testified at trial, the mother's case had been closed for inactivity. The mother admitted that she quit attending counseling sessions with Ms. Dowse in April 2015, attributing it to an upsetting incident with a friend and explaining, "Everybody makes mistakes, and that was one of mine." RP at 380.

### Substance Abuse Services

DSHS provided the mother with intensive outpatient treatment for cannabis dependence, which she began on December 3, 2013. She was not compliant with the program, attending only 45 of 66 sessions; 12 of her absences were excused, 9 were unexcused. The mother was placed on a treatment contract on March 12, 2014, to address her attendance issues. She was discharged from the program about 11 weeks later, on May 30, 2014, for failing to attend.

DSHS provided the mother with another substance abuse assessment a month later, on July 31, 2014, and she was again diagnosed with cannabis dependence. Outpatient treatment was again provided. She initially attended 20 of the 25 sessions, which were held 3 times a week; one absence was excused, the other 4 were unexcused.

5

At the end of November, she switched to weekly outpatient groups and attended only 11 of 28; three absences were excused, 14 were unexcused.

DSHS also offered the mother random urinalysis testing, with the following results:

| DATE | RESULT |
| --- | --- |
| October 21, 2013 | Negative |
| December 3, 2013 | Positive for methamphetamines and amphetamines |
| December 18, 2013 | Negative |
| January 22, 2014 | Positive for amphetamines (consistent with K.B.'s prescription for Adderall)[2] |
| February 3, 2014 | Negative |
| March 3, 2014 | Positive for amphetamine (consistent with Adderall) |
| April 7, 2014 | Positive for amphetamine (consistent with Adderall) |
| May 2, 2014 | Negative |
| July 31, 2014 | Positive for amphetamine (consistent with Adderall) |
| September 11, 2014 | Positive for amphetamine (consistent with Adderall) and morphine |
| October 2, 2014 | Negative |
| November 10, 2014 | Presumptive Positive (refused to provide urinalysis) |
| November 24, 2014 | Positive for benzodiazepine (consistent with K.B.'s prescription for Lorazepam) |
| December 18, 2014 | Presumptive Positive (refused to provide urinalysis) |
| December 26, 2014 | Positive for amphetamines, methamphetamines, codeine, morphine, oxycodone, and cannabis |
| December 29, 2014 | Positive for morphine and cannabis |

The mother was reassessed in February 2015 as a result of the December 26, 2014 urinalysis, and was diagnosed with amphetamine dependence. Her treatment

---

[2] A drug treatment supervisor testified that the results suggest that the mother was not consistently taking Adderall, since she sometimes tested negative for amphetamine.

recommendation changed from outpatient to short-term inpatient treatment. To secure a bed date for inpatient treatment, she was required to attend a weekly group, but she attended only 2 of 15 sessions; 3 absences were excused, 10 were unexcused. She was also ineligible to attend inpatient treatment while using her prescriptions for benzodiazepine (Lorazepam) or amphetamine (Adderall). She never entered inpatient treatment.

### *Medical Care Training*

The primary concern about caregiver understanding of the twins' medical care was that they properly care for the girls' feeding tubes. If the tubes were pulled or twisted they could come out and would have to be surgically inserted again. The mother and foster mother attended a session at which both received training on how to care for the feeding tubes. DSHS later scheduled an appointment for the mother to be retrained, but she missed it. She was then provided, verbally, with a list of doctors' names and phone numbers to contact for retraining, but there is no evidence she ever followed up.

### Termination Proceedings

DSHS initiated termination proceedings on August 8, 2014. Trial was held over three days in April and June 2015.

As reviewed above, in the six months before trial, the mother increasingly failed her UAs: four of six tested positive. She largely ceased attending or even asking to be excused from the weekly meetings required for her to be eligible for inpatient treatment.

7

Given circumstances existing at the time of trial, Dr. Van Wey testified that the mother was incapable of parenting at that time.

Dr. Van Wey testified at trial that if the mother changed her ways, she would need at least a year before she could be stable enough to parent and even then, Dr. Van Wey did not view the odds of the mother succeeding as favorable:

> You know, starting today, she would need one year of counseling and chemical dependency treatment with near perfect compliance. I mean we kind of talked about 90 percent compliance. So if she participated for 12 months, and she did substance abuse counseling, and she did psychotherapy, and she was engaged throughout that entire time, I think you would probably see some change at the end of that one year.
> Would she be prepared to parent two medically fragile children at that point, there is no way to know. I think the chances are maybe less than 50 percent at that time. And the reason I say that is because I don't know how responsive she will be in treatment because of her cognitive disorder.

RP at 144. Dr. Van Wey explained that her prognosis for the mother was guarded because of the mother's lack of insight into her issues and "her tendency to either deflect or deny or externalize" her problems. RP at 137.

At the time of trial, the twins still required feeding tubes, but the foster mother testified that the tubes were hopefully going to be removed by the middle or end of the summer. The twins had never been in their mother's care, and there was testimony that they were well bonded with the foster mother.

At the end of trial, the judge terminated the mother's parental rights, finding that "[t]he mother's primary unresolved parental deficiencies that prevent return of [her

8

children] are substance abuse and mental illness." CP (33693-0-III) at 97; CP (33694-8-III) at 94. She appeals.

## ANALYSIS

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Because parents have a fundamental liberty interest in the custody and care of their children, the State may terminate parental rights "'only for the most powerful [of] reasons.'" *In re Welfare of S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (internal quotation marks omitted) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

Washington statutes respond to this constitutional command by providing a two-step process before a court may terminate parental rights.

The first step requires that the State prove six statutory elements, the first three of which are procedural and are seldom in dispute.[3] Where a termination decision is appealed, it is the State's proof of the remaining elements that are most often challenged—those being its burden of proving:

---

[3] The three rarely disputed elements appear at RCW 13.34.180(1)(a)-(c) and deal with findings, orders, and timelines that are made or pass before the termination trial.

> [t]hat the services ordered [to be provided to the parent] . . . have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided,

RCW 13.34.180(1)(d);

> [t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future,

RCW 13.34.180(1)(e); and

> [t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(f).

This first step of the termination process "focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence." *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (footnote omitted). "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). In addition to finding the six statutory elements, due process requires that a court make a finding of current parental unfitness before parental rights can be terminated. *In re the Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995) (citing *Santosky*, 455 U.S. at 747-48). This finding need not be made explicitly, and satisfying all six of the statutory elements raises an implied finding of parental unfitness. *In re Parental*

10

*Rights to K.M.M.*, No. 91757-4, slip op. at 11 (Wash. Sept. 8, 2016),

https://www.courts.wa.gov/opinions/pdf/917574.pdf.

The second step of the termination process is for the court to ascertain the best interests of the child. RCW 13.34.190(1)(b). "Because the parent's rights will already have been observed in the first step, this second step need be proved by only a preponderance of the evidence." *A.B.*, 168 Wn.2d at 912.

In this case, the mother of Kh.V.-B. and Ka.V.-B. argues that the record does not support the trial court's findings that (1) DSHS provided her with all necessary services to correct her parental deficiencies, (2) there was little likelihood that conditions would be remedied so her daughters could be returned to her in the near future, and (3) termination of her parental rights was in the girls' best interest.

In reviewing a trial court's decision to terminate parental rights, we will uphold its factual findings "if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *K.S.C.*, 137 Wn.2d at 925. "Because of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.'" *K.M.M.*, slip op. at 8 (quoting *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)). We defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence. *Id.* at 8-9. We review de novo whether its findings of fact support its conclusions of law. *Id.* at 9.

11

We address the mother's challenges to the three findings in turn.

*I.    Sufficiency of the evidence to demonstrate the State's offer or provision of necessary services*

The State's burden of proving it offered all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future requires proof that it offered services "tailored to each individual's needs." *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). The services must be offered in a timely manner. *S.J.*, 162 Wn. App. at 881-83. While the legislature has not defined "necessary services," case law has defined that term to mean "those services 'needed to address a condition that precludes reunification of the parent and child.'" *K.M.M.*, slip op. at 12 (quoting *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014)).

The mother argues the State did not provide her with all necessary services because it failed to provide her with integrated treatment for her co-occurring cognitive disorders or medical training to care for the twins' feeding tubes.

Her first contention—that DSHS failed to provide her with the integrated services recommended by Dr. Van Wey—is not supported by the record. She likens her case to *S.J.*, in which the mother had bipolar disorder and substance abuse issues and, despite knowing of the mother's mental health issues, DSHS failed to refer her for mental health services until eight months after S.J. was removed from the home. 162 Wn. App. at 882.

12

During that time, the mother unsuccessfully attempted to complete inpatient treatment for substance abuse three times. This court recognized that her failures at treatment could be linked to her untreated bipolar disorder; soon after the mother received mental health services that improved her ability to identify symptoms of a bipolar episode, she successfully completed inpatient treatment. *Id.* This court held that if DSHS had offered co-occurring treatment sooner, her attachment with her son might not have deteriorated.

Here, by contrast, the mother received treatment on parallel tracks: she received substance abuse treatment beginning in December 2013 and mental health treatment beginning in February 2014. While the results of the neuropsychological examination were not available to inform her mental health treatment until September 2014, that is because the mother failed to attend the first appointment scheduled with Dr. Van Wey. And while some witnesses expressed doubt that the mental health services would be successful until the mother attained sobriety,[4] the fact remains that she was receiving both services simultaneously.

The mother attempts to buttress this challenge by arguing that DSHS did not provide the exact service recommended by Dr. Van Wey, which included psychotherapy with a provider "comfortable treating the complex interplay of personality disorder, anxiety, low verbal intelligence, and substance abuse history." RP at 154. Upon

---

[4] The mother challenges the trial court's finding that this was Dr. Van Wey's view, but it was, as she repeated during her testimony. *E.g.*, RP at 161, 170-71.

13

questioning by the court, however, the social worker assigned to the mother's case testified she did provide the mother with a referral to Grant Mental Healthcare for the services recommended by Dr. Van Wey, saying that Grant Integrated Services "do[es] all of those things" and that she attempted to obtain weekly therapy for the mother. RP at 277-78.

The mother fastens on Dr. Van Wey's testimony that there are not a lot of providers with a good command of "how those things all impact a person's functioning" and "hypothetically, if [the mother] was referred to a counselor who didn't specialize in these areas," the service would not be completely beneficial. RP at 155-56. But Ms. Dowse testified she had reviewed Dr. Van Wey's report and "I felt with my specialty and my background, I would be able to work with her on that." RP at 188. Elsewhere, Ms. Dowse testified that "one of my other specialties is working with individuals that . . . have cognitive deficits." *Id.* at 189. We have not been directed to any part of the record establishing that Ms. Dowse's skill set fell short of what Dr. Van Wey had in mind.

The mother also argues that DSHS failed to offer her the same training on how to properly care for the twins' feeding tubes as was offered to the foster mother, likening her situation to that in *In re Welfare of C.S.*, 168 Wn.2d 51, 225 P.3d 953 (2010). In *C.S.*, the mother's lack of training in how to manage her child, who was difficult to manage as the result of a complex of disorders, was identified by the court as the reason for terminating her parental rights. The child's foster mother also had difficulty managing the child, but

14

unlike the mother, the foster mother was provided with needed training on how to effectively deal with and medicate his disorders.

Our first response to this argument is that the trial court in this case never identified the mother's inability to properly care for the twins' feeding tubes as a condition preventing reunification. The evidence established that care of the feeding tubes, which would soon be removed, was about to become a nonissue. As recently observed by our Supreme Court, "*C.S.* does not stand for the proposition that noncustodial parents must receive services identical to the foster parents." *K.M.M.*, slip op. at 22.

> As the primary caregiver, a foster parent has a fundamentally different relationship with a dependent child than a noncustodial parent. The services needed by the foster parents to adequately care for a child will likely be different from what may reasonably be available to a parent in many cases.

*Id.* at 23. Training to care for a premie, who is unlikely to need the same care once returned to a parent, falls into this category.

Moreover, DSHS had provided the mother with training once and offered her retraining, but the mother failed to follow up. Dr. Van Wey's testimony does not support the suggestion on appeal that the mother's inability to retain large amounts of verbal information made her incapable of writing down contact information provided by DSHS staff.

15

Substantial evidence supports the trial court's finding that the State provided the mother with necessary services.

### II. *Sufficiency of evidence to support the court's finding that there is little likelihood that conditions will be remedied in the near future*

"While RCW 13.34.180(1)(d) looks specifically at a parent's deficiencies, RCW 13.34.180(1)(e) more broadly requires '[t]hat there is little likelihood that *conditions* will be remedied so that the child can be returned to the parent in the near future." *K.M.M.*, slip op. at 26 (alteration in original). "A determination of what constitutes the near future depends on the age of the child and the circumstances of the placement." *In re Dependency of T.L.G.*, 126 Wn. App. 181, 204, 108 P.3d 156 (2005).

If the State offers or provides all necessary services reasonably capable of correcting parental deficiencies within the foreseeable future and the parent does not substantially improve within one year of the dependency order, a presumption arises that the State has demonstrated RCW 13.34.180(1)(e)'s requirement that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. *In re Welfare of T.B.*, 150 Wn. App. 599, 608, 209 P.3d 497 (2009). "A parent's unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether the State has satisfied RCW 13.34.180(1)(e)." *Id.*

16

The mother characterizes herself as having been "willing[ ] to address her substance abuse, as evidenced by her gradual improvement in outpatient programming" and as "awaiting a bed for a short inpatient program." Br. of Appellant at 17. This is not a fair characterization of the evidence presented at the termination trial. Evidence at trial supported the opposite conclusion: that she was no longer making any concerted effort to attain sobriety.

Because DSHS offered all necessary services, reasonably available, and the mother did not substantially improve within a year of the dependency order, the presumption arose that there was little likelihood she would remedy her parental deficiencies in the near future. She presented no evidence to rebut the presumption.

### III. *Best interest of the child*

The mother's last challenge is to the trial court's finding that termination of her parental rights was in the best interest of her twin daughters. In order to terminate parental rights, the State must establish by a preponderance of the evidence that termination is in the best interest of the child. RCW 13.34.190(1)(b). Whether termination of parental rights is in the best interest of the child is a fact-specific inquiry. *In re Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate

17

himself.'" *T.R.*, 108 Wn. App. at 167 (alterations in original) (quoting *In re A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

We need not repeat our discussion of the mother's lack of progress, her increasing noncompliance with substance abuse-related services, or Dr. Van Wey's guarded, pessimistic outlook that the mother would not remedy her deficiencies, even if given a year. The twins, almost two years old at the conclusion of the termination trial, had never been under the care of the mother. Substantial evidence supports the trial court's finding that "given the age of the child[ren], the child[ren]'s need for stability, and the need for a permanent and stable home it is in the best interest of the child[ren] that termination is granted." CP (33693-0-III) at 98-99; CP (33694-8-III) at 95-96.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____          _____
Lawrence-Berrey, A.C.J.                Pennell, J.

18