IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

In the Matter of the Dependency of ) No. 74911-1-I
C.L.M., DOB: 03/15/2010, and ) (Consolidated with Nos. 74912-9-I,
C.M., DOB: 01/23/2006, ) 74913-7-I, 74914-5-I)
)
               Minor children. )
)
STATE OF WASHINGTON, )
DEPARTMENT OF SOCIAL AND )
HEALTH SERVICES, )
) UNPUBLISHED OPINION
               Respondent, )
)
      v. )
)
LATAE MARIA MITCHELL and )
KENNETH LAVELLE MADDEN, SR., )
)
               Appellants. ) FILED: March 13, 2017

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2017 MAR 13 AM 11: 05

SCHINDLER, J. — Following a 13-day trial, the court terminated the parental rights

of Latae Maria Mitchell and Kenneth Lavelle Madden Sr. to their two children and

denied the petition to establish a guardianship. Mitchell challenges findings and

conclusions supporting the denial of the guardianship petition but does not challenge

the termination. Madden challenges findings and conclusions supporting the

termination of his rights and denial of the guardianship. We affirm.

Agreed Dependency

Mitchell and Madden are the biological parents of C.M., born in 2006, and C.L.M., born in 2010.

In 2011, Mitchell and Madden and the Washington State Department of Social and Health Services (DSHS) entered agreed orders of dependency. The agreed facts describe the children's exposure to domestic violence, Madden's long-standing substance abuse and mental health issues, physical abuse of the children by Mitchell and Madden, and the significant criminal records of Mitchell and Madden. Madden had recent diagnoses for major depression, polysubstance dependency, personality disorder with antisocial and paranoid traits, and borderline intellectual functioning. Madden's criminal record includes convictions for domestic violence property destruction and domestic violence interfering with reporting in 2009, criminal solicitation of a controlled substance in 2008, driving while license suspended in 2007, driving under the influence in 2005, and multiple violations of the Uniform Controlled Substances Act.[1] Mitchell's criminal record includes convictions for felony assault and forgery in 2009 and a 1997 misdemeanor assault that was deferred and dismissed.

The dependency orders required Mitchell and Madden to complete a drug and alcohol evaluation and any recommended treatment, urinalysis (UA), a psychological evaluation with a parenting component and any recommended treatment, intensive family preservation services (IFPS), and comply with probation requirements.

Less than a week after entry of the dependency orders in 2011, Mitchell assaulted a laundromat manager. Mitchell pleaded guilty to the felony assault.

---

[1] Chapter 69.50 RCW.

2

After completing the confinement portion of her sentence, Mitchell obtained a psychological evaluation in 2012. The evaluator diagnosed Mitchell with intermittent explosive disorder, attention deficit hyperactivity disorder (ADHD), and personality disorder with narcissistic traits. The evaluation states Mitchell was "defensive, externalized blame rather than accepting responsibility, lacked empathy for others, and had a propensity to be controlling in relationships." Mitchell also "displayed multiple incidents of violence grossly disproportionate to the triggering events." The evaluator states that "these issues" made it difficult for Mitchell "to respond to the needs of her children." The evaluator believed Mitchell's "serious psychological problems" would be "very difficult to treat" and would need to be resolved before she could safely parent her children.

The evaluator recommended numerous services including anger management classes, domestic violence counseling, mental health counseling, and one-on-one parent training. Despite 36 parent coaching sessions that included anger management, Mitchell did not "adequately absorb and implement the lessons," "remained unempathetic to the children," and continued to "put her needs ahead of theirs."

Mitchell also participated in domestic violence and mental health counseling. A domestic violence evaluation showed Mitchell had a "very high propensity for violence under provocation." The evaluator developed a treatment plan that included domestic violence treatment, anger management education, and mental health counseling. Mitchell's participation in the treatment plan was "inconsistent" and "she was eventually terminated from the program." In 2015, Mitchell again engaged in domestic violence

treatment but did not complete the program and did not participate in mental health counseling.

The dependency order required Madden to engage in several services including a "Psychological Evaluation with Parenting Component and Follow through with any Treatment Recommended." Shortly thereafter, Madden obtained a psychiatric evaluation at Atlantic Street Center.[2] The evaluator diagnosed him with ADHD, depression, and anxiety and prescribed ADHD medication and continuing therapy.

In November 2011, a permanency planning order noted the court-ordered psychological evaluation had not yet occurred because an "[a]greed provider" was "not available." But the order noted Madden "completed a psychiatric evaluation at Atlantic Street [C]enter," was in mental health counseling, and on medication management. An April 2012 review hearing order stated essentially the same thing but added DSHS recommended the "psychological evaluation . . . service order be removed."

Six months later, the court stated in a permanency planning order that the psychological evaluation service was "N/A" (not applicable):

> N/A[.] Father not referred[.] Father completed a psychiatric and medication management evaluation through Atlantic Street Clinic and has a primary diagnosis of ADHD, mixed type[.] This is being successfully treated through therapy and medication management[.] [DSHS] recommends removing this ordered service.

In April 2013, a dependency review order stated the psychological evaluation was "[d]eferred until father has 90 days of clean UAs and medication compliance."[3]

---

[2] The record is unclear as to whether DSHS provided this service or Madden obtained it on his own. In any event, a court may consider any service received for the correction of parental deficiencies regardless of whether the State provides or arranges for the service. In re Dependency of D.A., 124 Wn. App. 644, 651-52, 102 P.3d 847 (2004).

[3] Emphasis in original.

The order stated Madden had "multiple missed appointments and poor follow through with counseling and medication compliance." Subsequent orders stated Madden had "completed a mental health intake with [Sound Mental Health]" in June 2014 but he had not engaged in ongoing services, participated in visitation, or complied with UA testing.

Termination and Guardianship Trial

DSHS filed a petition to terminate the parental rights of Mitchell and Madden. Mitchell filed a petition to establish a guardianship with the children's maternal aunt and her husband, Misty and Lorenzo Merida. Madden joined in the petition. The court held a 13-day trial on the petition to terminate and the guardianship petition.

Social worker Janice Strong was assigned to the case from 2011 to 2014. Strong testified the children were removed from Madden's care on three occasions due to his substance abuse. DSHS repeatedly referred Madden to IFPS and mental health counseling. IFPS assisted Madden "in resolving barriers to attending his mental health services." In particular, IFPS assisted Madden in developing a plan for taking his ADHD medication so that he would not forget his appointments. Madden, however, did not consistently take his medication or consistently participate in mental health counseling.

Strong testified that while Madden did not receive the court-ordered psychological evaluation with a parenting component, the service became unnecessary. Strong testified Madden received the services through the psychiatric evaluation, mental health counseling, and IFPS including parenting instruction and the "Homebuilders" program.

Child Welfare and Family Services social worker Sophie Keefe-Bullock testified she was assigned to the case in early 2014. Madden was not actively engaged in

services at that time. Keefe-Bullock referred Madden for mental health services and urged him to "reengage in mental health and chemical dependency" services. At one point, Madden did "go back to complete both the mental health evaluation and the chemical dependency evaluation." Keefe-Bullock did not order a psychological evaluation because Madden had obtained a psychiatric evaluation and successful treatment with ADHD medication.

Keefe-Bullock also testified Madden lost a visitation contract due to missed visits that were often cancelled at the last minute. Keefe-Bullock then obtained a Friday visitation contract for Madden but he did not consistently attend visits with the children. The missed visits made C.M. "very anxious" because "he didn't know if they were going to be canceled or not." Keefe-Bullock testified Madden made no progress on his parental deficiencies during the time she handled the case.

Social worker Melissa Hoogendoorn testified Madden received mental health services and chemical dependency treatment at Sound Mental Health. Hoogendoorn did not refer Madden for a psychological evaluation with a parenting component because the service had been deferred until he could maintain a length of sobriety. Hoogendoorn saw no "red flags" that Madden had mental health issues other than those he was "already working" on with Sound Mental Health. When asked if she knew that Madden had been diagnosed with a depressive disorder, Hoogendoorn was unsure but said, "[T]hat would be something that I would think that he would be working on with his therapist" at Sound Mental Health. Hoogendoorn conceded she never confirmed whether Madden's therapist was treating his depression. When Hoogendoorn's work

with Madden ended, he was "still using alcohol and marijuana and PCP"[4] and "he was not consistently engaged in his mental health treatment."

Social worker Kristin Mayer worked with Madden in 2015. Mayer testified Madden "had been engaged with Sound Mental Health for mental health, medication management, and chemical dependency services, as well as UAs." But Madden did not consistently take his ADHD medication. When Madden failed to take the medication, "his mental health would spiral out of control." When asked if there were times when Madden seemed to be making progress, Mayer said, "No; quite the opposite." Mayer testified that Madden had "very poor impulse control" and "would escalate very often" and "very quickly." Mayer stopped working with Madden after he physically threatened her.

Social worker Romeo Garcia testified that he took over for Mayer in July 2015. Garcia was aware that Madden engaged in mental health services with Atlantic Street Center and Sound Mental Health. Garcia and Madden discussed the need to re-engage in mental health services and drug treatment. Despite Madden's strong interest in those services, he did not follow through. When asked if there were any other necessary mental health services "that haven't been ordered but could be provided," Garcia said, "[N]o, not at this time." When asked if there were "any issues that [Madden] had that would not have adequately been addressed by the mental health and drug and alcohol services that he was receiving," Garcia said, "No." Garcia did not order the psychological evaluation because it had been deferred pending a period of sobriety.

---

[4] Phencyclidine, also known as "angel dust."

7

Atlantic Street Center mental health therapist Al Davis III testified that he treated Madden for approximately one year. Madden's attendance at sessions declined over time and he eventually lost his insurance coverage. Davis told Madden that Atlantic Street Center could help him regain his coverage but Madden did not request assistance. Davis testified that Madden was receiving all the treatment he needed at Atlantic Street Center and that he would have referred Madden for additional services if he felt Madden needed them.

Sound Mental Health chemical dependency and mental health counselor Amy Plumb treated Madden for substance abuse in a group setting in 2012 and 2013. Starting in October 2014, Plumb treated Madden concurrently for substance abuse and mental health issues in both a group setting and individual sessions. During their sessions, they talked about his depression. Plumb did not recommend additional services. Plumb testified she would have referred Madden for additional services if she had seen any signs that he needed them. Although Madden had appointments every two weeks, he met with Plumb only about once a month. In March and April 2015, Madden's UAs were positive for PCP and marijuana. Madden then missed a series of appointments with Plumb.

DSHS Children's Administration Division of Licensed Resources social worker and home studies specialist Cynthia Hostetler conducted a home study with the Meridas. The Meridas have two adult children. One child has Asperger's syndrome and obsessive-compulsive disorder.

Hostetler concluded a guardianship would not be in the children's best interests because the Meridas lacked the experience and skills necessary to care for C.M. and

8

C.L.M. "given the severity of their special needs." Hostetler's report noted C.M. was diagnosed with post-traumatic stress disorder (PTSD) and ADHD and engaged in self-harming or suicidal behaviors, including putting a belt so tightly around his neck that it bruised him and scraping his wrists with knives and cork screws. C.M. sometimes screams for hours or runs away when things do not go his way. C.L.M. also has PTSD and exhibits "challenging behaviors including running away, hitting, kicking and punching her caregivers and younger children." The report states C.L.M. pulled her pants down in public and invited another child to put his face on her bottom. The report states the children can be physically aggressive toward each other and prior attempts to place them together "in very skilled foster homes" failed.

The report cautioned that the children "require consistent supervision, clear communication from their caregivers and caregivers that are able to meet their needs and address their behaviors immediately." Hostetler concluded the Meridas do not have the "experience with parenting children with self-harming behaviors, running behaviors, screaming for hours, and inappropriate invitations towards other children of a perceived sexual nature." Hostetler states these deficiencies are compounded by Mr. Merida's "very, very minimal" parenting experience. Hostetler states that while the Meridas' experience with their own special-needs child was helpful, their son presented "nowhere near" the challenges the Meridas would face with C.M. and C.L.M.

The report emphasizes the children had "recently begun to stabilize, both because of their current caregiver's skills and also the support of the trauma focused cognitive behavioral therapy." Hostetler worried "this stabilization may unravel" if the children are moved.

Mitchell and Madden hired independent child welfare consultant Sonja Ulrich. Ulrich conducted a home study of the Meridas and concluded a guardianship with the Meridas would be in the children's best interests. Ulrich emphasized the Meridas' "multiple trainings" in preparing for foster parent licensure, Mrs. Merida's participation in numerous online courses for her work as a caregiver, the Meridas' hiring of a parent coach to assist them with C.M.'s and C.L.M.'s issues, and other preparation they voluntarily undertook for parenting the children. Ulrich disagreed with the central conclusions in Hostetler's home study report including concerns about the Meridas' ability to handle the children's issues.

Social worker Garcia testified that a guardianship with the Meridas was not in the children's best interests. Garcia stressed the importance of the children's recent progress and stable placements. Garcia also testified he did "not believe the Merida family is able to meet the needs of" C.M. and C.L.M.

Court-appointed special advocate Judith Lang testified she had several "concerns" about a guardianship. Given the children's extreme behaviors, Lang believed the Meridas would be challenged by taking in even one of the children. Lang recommended the court deny the guardianship petition and terminate parental rights.

The court found Madden had "been offered or provided all court-ordered services." The court noted that while the dependency order required a psychological evaluation with a parenting component, in April 2014, "the court ordered that the evaluation would not be initiated until the father had provided [90] days of clean UAs." The court found Madden did not provide 90 days of clean UAs. However, the court found the psychological evaluation with a parenting component "would not have

resulted in a different outcome" because Madden received a comparable evaluation and

services and failed to participate consistently in the services he received.

> [E]ven if [DSHS] had scheduled the father for a psychological evaluation with parenting component, that would not have resulted in a different outcome. The father had a psychiatric evaluation which made treatment recommendations; he did have mental health counseling, and both of his counselors felt that the treatment was appropriate, that ADHD treatment was the father's primary treatment need, and that the father would have been referred for additional treatment or evaluations if they felt that it was necessary. In addition, the father declined to fully participate in the mental health services that were offered and available to him.

In addressing termination of Madden's parental rights, the court found there was

"little likelihood that conditions will be remedied so that the children can be returned to

the father in the near future."

> There is little likelihood that conditions will be remedied so that the children can be returned to the father in the near future. The father has been offered or provided all necessary and appropriate remedial services but has failed to participate, or has participated but has been unable to apply the information in a real-world setting. The father did not consistently take his ADHD medication despite his awareness of its positive effects and despite the efforts of social workers and providers to encourage him to take the medication consistently. The father testified to his inability to stop using PCP since he started using it as a teenager, despite multiple treatment attempts; he has been able to remain clean for a period of 90 days only once in the last five years. The father continues to face incarceration and resulting unavailability to parent for crimes related to his substance use. The father has not been able to make consistent visits with his children, much less undertake full parental responsibilities for their care. The court overseeing the dependency has not returned any of the children to the father's care since the children were removed by the court in July of 2012 . . . and the father has not asked that court to do so.

As to Mitchell, the unchallenged findings of fact state, in pertinent part:

> There is little likelihood that conditions will be remedied so that the children can be returned to the mother in the near future. The mother has been offered or provided all necessary and appropriate remedial services but has failed to participate, or has participated but has been unable to apply the information. Ms. Patrick utilized all of her known coaching tools

11

and techniques but the mother did not make significant progress. The mother did not complete the treatment recommended by Dr. Shepel, who testified that the mother's progress would be measured by changes in her response to frustration. It is clear that she continues to suffer from difficulty in controlling her temper. She testified that due to her frustration with her business partner, and with allegations about sexual abuse of [C.L.M.], she left the state for several months because if she remained present she might do something dangerous. As a result she was unable to visit with her children or work towards reunification with them during that time. The mother was very volatile in court, interrupting lawyers and the court, and accepting no responsibility for this behavior. In March of 2015 - after she had participated in extensive services and testified that she had learned how to avoid and/or walk away from conflict - she assaulted her sister, for which she was convicted of Felony Assault 3 - [Domestic Violence] and now faces many months of incarceration, during which time she will be unavailable to parent her children. The mother has not been able to make consistent visits with her children, much less undertake full parental responsibilities for their care; she has lost multiple visitation supervision contracts for failure to engage in visitation, and due to the extreme negative emotional reaction by [C.L.M.] the mother's visitation with that child was suspended by the court in the fall of 2015. The court overseeing the dependency has not returned any of the children to the mother's care, and the mother has not asked that court to do so.

The court found by clear, cogent, and convincing evidence that continuation of the parent-child relationship would diminish the children's prospects for early integration into a stable and permanent home and that termination of parental rights, rather than a guardianship, was in the children's best interests. The findings state, in pertinent part:

2.19 Continuation of the parent-child relationship is an obstacle to permanency for these children. The children are adoptable and have the potential for adoption if made legally free. Adoption is not possible while parental rights remain intact. The proposed permanency alternative of Guardianship is not in the children's best interests.

2.20 Continuation of the parent-child relationship, and thus the parental right to visitation, is also emotionally disruptive to the children and would interfere with their ability to stabilize in placement. The intermittent nature of the parents' visitation with the children has had an extremely negative effect on the children's psychological well-being.

. . . .

2.22    . . . Mrs. Merida has experience raising a special needs child of her own, and has made efforts to educate herself about these children's needs. The children share strong although somewhat troubled bonds between each other and with their parents. Continued contact with siblings and extended family would probably be beneficial to the children. But these considerations are outweighed in this case by other more compelling considerations, and therefore guardianship would not be in the children's best interests.

2.23    The need for continued State involvement with these children is critical. It would not be in these children's best interest to grant the petition for guardianship, dismiss the dependency, and hope that placement with the Meridas went well. There is no existing bond between the children and the proposed guardians, who have met the children only a handful of times several years ago. Both children have been hard to place successfully in the past. Both children require support services and benefit from continued oversight by [DSHS] and the court.

2.24    In addition it would not be in the children's best interest to place them together in the same home at this time. Children with such behavioral issues can exacerbate each other's behaviors. In addition [C.L.M.] has expressed some fear of [C.M.]. Most importantly, [C.L.M.] has engaged in sexualized behaviors and has referred to "the brother-sister game." Therefore to place her in a home with her brother while she is behaving in this manner would put both children at serious risk.

2.25    In addition to the above issues, [C.M.] has an established relationship in his current and potentially adoptive placement, and is finally making progress on his significant emotional issues as a result of that stability. [C.M.] is a particularly difficult child who requires many special services. [C.M.'s] therapist has indicated that another change of placement - and especially an abrupt change - would be detrimental to the child's welfare. It would not be in his best interests to disrupt his current placement and move him into the home of people he barely knows. Also [C.M.'s] parents and providers have specifically emphasized that in managing his behaviors it is particularly important to have clear communication with [C.M.]; while Mr. Merida is very earnest and well-meaning, the court had the opportunity to observe his testimony and it is clear that his communication ability . . . is not currently sufficient to meet [C.M.'s] needs from a parental figure.

2.26   . . . As noted above it is not in the children's best interest to be placed together at this time.  Unlike [C.M.], [C.L.M.] is not currently in a stable placement, but even if the court were inclined to continue the guardianship petition briefly for [C.L.M.] to be transitioned into the Meridas' care, this is not simply a matter of waiting a few weeks for a child to be moved into a new home.  Rather the issue is the need for continued court and [DSHS] oversight that makes near-term dismissal of the dependency contrary to the child's best interest.  [C.L.M.]'s therapist has testified to the child's significant emotional issues and the need for long-term and evolving therapy.  These needs will only be intensified by a move to an entirely new location with people she barely knows.  It would not be in [C.L.M.]'s best interest to move her into the Merida's home and dismiss the dependency, and then hope for success.  [C.L.M.]'s interests are best protected by having continued [DSHS] involvement and court oversight of her new placement.  While some minimal court oversight is possible within the context of a guardianship, [C.L.M.]'s interests are much better protected by having [DSHS] continue to assess her needs and to assist with providing supportive services on an ongoing basis, and by her case being subject to regular court review.  These same concerns hold true for [C.M.] as well.  Both children have difficult placement histories and it is important for [DSHS] to oversee their placements, provide supportive services, and also to be able to come to court and obtain authority for immediate placement elsewhere in the event that their placements were to disrupt in the future as they have in the past.

## Standard of Review

Madden appeals the termination of his parental rights.  Mitchell and Madden also appeal the denial of their guardianship petition.

Parental rights are a fundamental liberty interest protected by the United States Constitution.  Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).  To terminate parental rights, the State must satisfy a two-step test.  RCW 13.34.180(1), .190(1).  First, the State must prove the following statutory elements by clear, cogent, and convincing evidence:

(a) That the child has been found to be a dependent child;

14

> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; and
> (f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1); .190(1)(a)(i). If the State satisfies these criteria, the court may terminate parental rights only if the State also demonstrates by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1)(b).

A guardianship must be ordered if the statutory criteria in RCW 13.36.040(2)(c) are established by a preponderance of the evidence and the court finds under RCW 13.36.040(2)(a) that guardianship, rather than termination, is in the child's best interests. In re Welfare of A.W., 182 Wn.2d. 689, 698-99, 344 P.3d 1186 (2015). RCW 13.36.040(2) provides, in pertinent part:

> A guardianship shall be established if:
> (a) The court finds by a preponderance of the evidence that it is in the child's best interests to establish a guardianship, rather than to terminate the parent-child relationship and proceed with adoption, or to continue efforts to return custody of the child to the parent; and
> . . . .
> (c)(i) The child has been found to be a dependent child under RCW 13.34.030;
> (ii) A dispositional order has been entered pursuant to RCW 13.34.130;
> (iii) At the time of the hearing on the guardianship petition, the child has or will have been removed from the custody of the parent for at least six consecutive months following a finding of dependency under RCW 13.34.030;

15

         (iv) The services ordered under RCW 13.34.130 and 13.34.136 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided;
         (v) There is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and
         (vi) The proposed guardian has signed a statement acknowledging the guardian's rights and responsibilities toward the child and affirming the guardian's understanding and acceptance that the guardianship is a commitment to provide care for the child until the child reaches age eighteen.

Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings will be upheld if they are supported by substantial evidence. J.F., 109 Wn. App. at 728; In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Because the burden of proof in a termination proceeding is clear, cogent, and convincing evidence, a finding is supported by "substantial evidence" if there is sufficient evidence to conclude that the fact is "highly probable." In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008). Because the trial court hears the testimony and observes the witnesses, the decision of the court is entitled to deference. A.V.D., 62 Wn. App. at 568. We therefore defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. A.V.D., 62 Wn. App. at 568; In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011); State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Termination of Madden's Parental Rights

Madden contends the trial court erred in terminating his parental rights because DSHS did not provide a psychological evaluation and therefore did not prove it had provided all court-ordered services as required by RCW 13.34.180(1)(d). Madden

16

acknowledges the court's finding that a psychological evaluation was unnecessary because he received equivalent services and that an additional evaluation and associated services would have been futile given his failure to consistently engage in services. Madden argues, however, that the finding is not supported by substantial evidence.

A guardianship petitioner must prove that all necessary services were offered or provided during the dependency. RCW 13.36.040(2)(c)(iv). DSHS contends that by joining in the guardianship petition, Madden waived the argument that DSHS did not provide all court-ordered services. DSHS overlooks the standard that for a guardianship, the necessary services element can be proven by a preponderance of the evidence. RCW 13.36.040(2)(a). However, to terminate parental rights, DSHS must prove the necessary services element by clear, cogent, and convincing evidence. RCW 13.34.180(1); .190(1)(a)(i). DSHS does not explain how a concession that the services element was proven by a preponderance of the evidence in a guardianship petition precludes Madden from arguing in a termination petition that the services element was not proven by clear, cogent, and convincing evidence. Nor does DSHS cite any authority for this proposition. DSHS thus fails to demonstrate waiver.

On the merits, it is undisputed that the court ordered Madden to undergo a psychological evaluation with a parenting component and found that "even if [DSHS] had scheduled the father for a psychological evaluation with parenting component, that would not have resulted in a different outcome" because Madden "had a psychiatric evaluation which made treatment recommendations; he did have mental health counseling, and both of his counselors felt that the treatment was appropriate." In its

17

oral ruling, the court noted several caseworkers testified that "[n]othing else was left to provide" after Madden received the psychiatric evaluation and associated services. The finding is supported by substantial evidence.

Madden obtained a psychiatric intake evaluation at the outset of the dependency. That evaluation resulted in a diagnosis of ADHD, anxiety, and depression; ongoing mental health counseling addressing those conditions; and medication that successfully treated Madden's ADHD. Madden also obtained a mental health evaluation in 2014 at Sound Mental Health and received parenting instruction through multiple referrals to IFPS and Homebuilders. Plumb testified she would have referred Madden for additional treatment or evaluations if he needed them. Hoogendoorn said she saw no indication that Madden needed additional mental health services. Strong and Keefe-Bullock testified the mental health and parenting services Madden received at Atlantic Street Center and Sound Mental Health rendered the court-ordered service unnecessary. And Davis and Garcia testified that Madden was receiving all the mental health services he needed.

The trial court also found that a psychological evaluation with a parenting component would have been futile. " 'Where the record establishes that the offer of services would be futile, the trial court can make a finding that [DSHS] has offered all reasonable services.' " In re Parental Rights to K.M.M., 186 Wn.2d 466, 483, 379 P.3d 75 (2016) (quoting In re Welfare of C.S., 168 Wn.2d 51, 56 n.2, 225 P.3d 953 (2010)); M.R.H., 145 Wn. App. at 25. The trial court found Madden "declined to fully participate in the mental health services that were offered and available to him." The finding is supported by substantial evidence.

The dependency review orders repeatedly noted Madden's failure to follow through with mental health services and the trial court found Madden failed to successfully complete or consistently participate in most of the other services provided including visitation, UAs, medication management and counseling, and substance abuse treatment. His caseworkers and service providers testified to these inconsistencies as well. Even assuming a psychological evaluation might have provided additional diagnoses or insights not discovered in his psychiatric evaluation, there was no reason to believe Madden would consistently participate in any services recommended by a psychological evaluation given his failure to consistently utilize equivalent services. Substantial evidence supports the court finding that any additional evaluation and treatment would have been futile. See In re Parental Rights to B.P., 186 Wn.2d 292, 316 n.5, 376 P.3d 350 (2016) (failure to utilize services offered may show futility).[6]

Denial of Guardianship Petition

Mitchell and Madden challenge the court's findings that a guardianship was not in the children's best interests and that any benefits from continued contact with each other and their extended family were outweighed by other considerations. To establish a dependency guardianship, the court must find by a preponderance of the evidence that a guardianship rather than termination is in the best interests of the child. RCW 13.36.040(2)(a); A.W., 182 Wn.2d at 698-99. In making that determination, courts consider the specific facts of each case. A.W., 182 Wn.2d at 711. Relevant factors

---

[6] Because we conclude substantial evidence supports the court finding, we need not reach Madden's contentions that deferring the psychological evaluation "until father has 90 days of clean UAs and medication compliance" is contrary to S.J., 162 Wn. App. at 882, and that DSHS's failure to prove the necessary services element rendered "the court's 'best interests' determination . . . premature."

include the "strength and nature of the parent and child bond," the "benefit of continued contact with the parent or the extended family," the "need for continued State involvement and services," and "the likelihood that the child may be adopted if parental rights are terminated." A.W., 182 Wn.2d at 711-12.

Here, the trial court agreed with Mitchell and Madden that the children would likely benefit from continued contact with each other and their extended family. But the court found those benefits were outweighed by several factors. The findings of fact state, in pertinent part, that (1) there is "no existing bond between the children and the [Meridas]"; (2) Mr. Merida has minimal parenting experience; (3) "[b]oth children require support services and benefit from continued oversight by [DSHS] and the court"; (4) the children should not be placed together due in part to sexualized behaviors of C.L.M. that "put both children at serious risk"; (5) both children are adoptable; (6) C.M. "requires many special services," he "is finally making progress on his significant emotional issues" in a stable placement, and "[i]t would not be in his best interests to disrupt his current placement and move him into the home of people he barely knows"; (7) C.L.M. has similar issues including "significant emotional issues" that require "long-term and evolving therapy"; (8) inconsistent visitation "had an extremely negative effect on the children's psychological well-being"; and (9) both children's interests "are much better protected by having [DSHS] continue to assess [their] needs," "assist with providing supportive services on an ongoing basis," and subject their placements "to regular court review."

Mitchell and Madden challenge the finding in factor (1) that the children have no bond with the Meridas, but they do so in a conclusory fashion with no supporting

20

argument or discussion of the record. This is insufficient. Saunders v. Lloyd's of London, 113 Wn.2d 330, 345, 779 P.2d 249 (1989) (issues unsupported by adequate argument and authority need not be considered). Nonetheless, there is ample evidence in the record that C.M. and C.L.M. have had very little contact with the Meridas and do not share a bond of any significance with them.

Mitchell and Madden do not challenge the findings in factors (2), (4), (5), (6), (7), and (8) except to the extent that they disagree with the weight the trial court accorded those factors. As noted above, because we defer to the trier of fact on the weight or persuasiveness of the evidence, the claim is beyond our review.

Mitchell and Madden challenge the findings in factors (3) and (9) to the extent that the factors indicate DSHS is better able than the Meridas to provide the services the children need. Mitchell and Madden note that under RCW 13.36.050(1)(b), a court overseeing a guardianship has authority to "[s]pecify the guardian's rights and responsibilities concerning the care, custody, control, and nurturing of the child[ren]." But Mitchell and Madden provide no evidence that the services and oversight available through DSHS would be available to the Meridas under RCW 13.36.050(1). Mitchell and Madden point to the testimony of their independent child welfare consultant Sonja Ulrich, who conducted a home study of the Meridas, to argue there are "numerous professional agencies in the area that could work with the children where they would be living in the guardianship." But even assuming the accuracy of that testimony, utilizing and financing such services without DSHS assistance would put responsibilities and financial pressures on the guardians that do not exist for parents receiving guidance and services through DSHS.

In any event, the availability of services in a guardianship was just one of many factors the court weighed in determining whether a guardianship was in the children's best interests. Most of the other factors cited by the court are not challenged on appeal. Instead, Mitchell and Madden contend the court should have given more weight to the independent home study, Mitchell's progress, the value of family placement, and the children's bond with each other and their mother. But again, these arguments go to the weight and persuasiveness of the evidence and are beyond the scope of review. Substantial evidence supports the finding that a guardianship was not in the best interests of C.M. and C.L.M.

We affirm the order terminating the parental rights of Mitchell and Madden to C.L. and C.L.M. and the order denying the petition to establish a guardianship.[7]

WE CONCUR:

---

[7] We note DSHS indicates in its brief on appeal that C.L.M. was placed with the Meridas and that the Meridas "passed a home study specific to C.L.M. in preparation for her adoption."