[No. 26179-4-III.   Division Three.   August 2, 2011.]

*In the Matter of the Welfare of* S.J.

874

*David L. Donnan* and *Lila J. Silverstein* (of *Washington Appellate Project*), for appellant.

*Robert M. McKenna, Attorney General*, and *Pamela V. Reuland* and *Amy S. Mickey, Assistants*, for respondent.

¶1 BROWN, J. — TH appeals the termination of her parental rights to her son, SJ. Dispositive here, TH contends the trial court erred in finding all necessary services had

been offered or provided because the Department of Social and Health Services (DSHS) failed to provide timely mental health services or sufficient attachment and bonding services. We agree. Additionally, TH contends her constitutional due process rights have been violated because the trial court did not specifically find she was currently an unfit parent and we agree that finding cannot be inferred. We reverse and remand for further proceedings.

## FACTS

¶2  SJ was born to TH in November 2002. In April 2005, DSHS removed SJ and his older half-brother from TH's care due to allegations of unsanitary living conditions and TH's drug use. The parties agreed to dependency on May 31, 2005. The court required TH to complete a substance abuse evaluation and treatment; submit to random urinalysis (UA) testing; complete a psychological evaluation and participate in mental health services; join a domestic violence victims' program; participate in a parenting assessment; and establish a safe, clean, drug-free home.

¶3 Between June 2005 and December 2005, TH was admitted to but unsuccessfully discharged from three inpatient treatment centers. TH discovered she was pregnant in January 2006. TH successfully completed an inpatient treatment program in February 2006. She planned for an outpatient program and arranged for posttreatment living at the Safe Harbor House and Maternity Home. In March 2006, TH participated in a psychological evaluation with Dr. Christine Guzzardo. TH's social worker informed Dr. Guzzardo of TH's history of drug addiction and mental health issues. Dr. Guzzardo diagnosed TH with bipolar disorder and borderline intellectual functioning. TH began individual counseling, actively participating in her sessions and improving her ability to identify symptoms of a bipolar episode and get the help she needed. In April 2006, TH began supervised visitation with SJ at the YWCA. In May 2006, she transferred to the YWCA's parenting education

program. The parent educator provided TH with verbal and hands-on instruction during the visits.

¶4 Despite making progress in her initially identified parental deficiencies, DSHS decided TH still had not secured suitable housing or progressed in her relationship with SJ. In May 2006, DSHS petitioned to terminate TH's parental rights with SJ.

¶5 TH continued working on her deficiencies and successfully graduated from the drug-treatment outpatient program in June 2006. She explained she could have been successful sooner had her mental health issues been addressed at the same time. The State does not dispute TH has since remained clean and sober. TH moved into the Safe Harbor House and Maternity Home as planned. TH had her baby, JH, in August 2006. JH has remained in TH's care. In November 2006, TH moved into St. Margaret's women's shelter in order to find housing allowing SJ to live with her. While at St. Margaret's, TH successfully enrolled in school, obtained a job, attended domestic violence and parenting classes, and cared for JH.

¶6 In December 2006, TH and SJ began therapeutic visitation with Carol Thomas. Ms. Thomas' role was to help create a healthy parent-child relationship and ensure nothing detrimental was said to SJ. The therapeutic visitation continued until March 2007, just before trial, when the visits were suspended at Ms. Thomas' urging due to the harmful impact the visits were having on SJ. SJ's behavior towards TH had become increasingly resistant and challenging because of his unusual negative acting-out behaviors; he was controlling and increasingly aggressive. TH had faithfully kept the scheduled visitations and had applied parenting suggestions but she met increasing resistance from SJ when she attempted physical contact or to maintain control over the visitations. TH theorized SJ had detached from TH and had attached to the foster parents, who had successfully intervened in this case. SJ clung to the foster parents at visitation drop off and the foster parents noticed SJ's increased stress at pick up. At the

termination trial, the family preservation therapist testified she could provide attachment therapy and that TH had requested it. These unprovided bonding-and-attachment services are central here.

¶7 DSHS's social worker testified he identified bonding and attachment as a major issue between TH and SJ. Despite this, he had not referred TH for bonding-and-attachment services because he (incorrectly as noted below) believed the YWCA was incorporating the methods into its parenting education, he did not receive a complaint from TH regarding the services, and he did not want to refer TH to additional services to save her time traveling on the bus. The social worker testified TH was not referred for a psychological evaluation until December 2005 because the court order specifically stated that the evaluation was not to be conducted until TH was sober. He conceded since TH completed treatment, he had no concerns about her sobriety and she had complied with all services offered to her. The social worker testified he supported the termination despite his recommendation that JH remain with TH because TH has not been able to rectify her relationship with SJ and because he had been out of her care for approximately one and a half years. He found that SJ could not wait any longer for TH to remedy her parental deficiencies and that he was in need of stability.

¶8 The YWCA parent educator testified her role during the visitation was to provide parenting suggestions and she related that the YWCA includes some bonding-and-attachment principles like cuing but, contrary to the social worker's viewpoint, does not offer bonding-and-attachment services. She noted TH struggled with keeping to a schedule during the visits and that SJ's behavior would escalate during the visits. In the end, the parent educator opined TH had not made any progress in her parenting of SJ because she was unable to recognize SJ's emotional needs.

¶9 Ms. Thomas noted TH's attempts to provide behavior controls and to guide and direct SJ were minimal and ineffective. She opined TH was unable to supply SJ with

emotional support, to calm SJ down, or to initiate physical contact with SJ without SJ's becoming angry. Ms. Thomas acknowledged she did not know if TH had had enough time to correct her inability to regulate SJ's behavior. She related she had not looked into or determined the source of TH's inability. Ms. Thomas related she was unaware of what TH's service providers identified as the source of the concerns regarding TH's parenting. Ms. Thomas had worked with families where "a child is very angry, very aggressive towards a parent, not defining them as a parental authority," and had had success "decreasing those behaviors, increasing their definition of the parent as a parental authority as someone who will direct and guide them and someone who can regulate their emotional states." Report of Proceedings (RP) (Mar. 26, 2007) at 27. In the end, Ms. Thomas opined it was unlikely that a healthy relationship would develop in the near future due to SJ's entrenched perception of his mother and TH's inability or unwillingness to parent SJ effectively.

¶10 The guardian ad litem testified SJ was a difficult child and had significant behavior problems including hitting, kicking, and cruelty to animals, destruction of property, and other violent behavior. She stated that SJ could not wait any longer for TH to remedy her parental deficiencies despite TH's success and improvement.

¶11 In its findings of fact the court found that despite the fact that TH had been offered a substance abuse evaluation and treatment, random UA/blood alcohol testing, a psychological evaluation, mental health services, domestic violence training, a parenting assessment, and parenting education, she had failed to repair her relationship with SJ. The court noted Ms. Thomas' testimony that TH was unlikely to be able to perceive and cope with SJ's behavior problems in the near future. The trial court terminated TH's parental rights with SJ.

¶12 TH appealed. This appeal was stayed in May 2008 pending a decision and mandate in *In re Welfare of A.B.*, 168 Wn.2d 908, 919, 232 P.3d 1104 (2010).

## ANALYSIS

¶13 The dispositive issue is whether the trial court erred in finding all necessary services had been provided. TH contends the State failed to provide timely mental health services and needed bonding-and-attachment services.

¶14 A parent has a fundamental liberty interest in the care, custody, and management of her child. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Thus, termination of parental rights should be allowed "only 'for the most powerful [of] reasons.'" *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995) (internal quotation marks omitted) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 738, 513 P.2d 831 (1973)). Washington courts use a two-step process when deciding whether to terminate parental rights. *In re A.B.*, 168 Wn.2d at 911; RCW 13.34.180(1), .190. "The first step focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence. The second step focuses on the child's best interests and need be proved by only a preponderance of the evidence. Only if the first step is satisfied may the court reach the second." *In re A.B.*, 168 Wn.2d at 911 (footnotes omitted).

¶15 The first step involves six statutory elements. RCW 13.34.180(1). They are:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the future[; and]

. . . .

(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). The trial court entered findings on all six elements. TH challenges the court's findings regarding (d), (e), and (f).

¶16 Our review is limited to determining if substantial evidence supports the trial court's findings of fact. *In re Welfare of C.B.*, 134 Wn. App. 942, 952-53, 143 P.3d 846 (2006). Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the declared premise. *Id.* at 953. Because the trial court has the opportunity to hear the testimony and observe the witnesses, its decision is entitled to deference. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Consequently, we do not judge the credibility of witnesses or weigh the evidence. *Id.*

¶17 The termination statute requires the State to prove DSHS "offered or provided . . . all and necessary services, reasonably available, capable of correcting the parental deficiencies." RCW 13.34.180(1)(d). To meet this statutory burden, the State must tailor the services it offers to meet each individual parent's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). DSHS, however, is not required to offer services when a parent is unable to benefit from the services. *Id.* at 163. Further, "even where the State inexcusably fails to offer a service to a willing parent, . . . termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future." *Id.* at 164.

¶18 TH first contends the State failed to tailor services to her needs because despite knowing she suffered from a mental illness, DSHS took a sequential approach

and failed to refer her to mental health services until December 2005. She contends coexistent mental health services were necessary for successful early treatment. Thus, she argues, the delay contributed to the deterioration of the once-strong bond with SJ. The State responds it relied on the court order specifically directing mental health services would be sequential to TH's sobriety and no evidence shows TH's failures to complete treatment were linked to her mental health. We disagree with the State.

¶19 First, the record reflects TH succeeded in inpatient treatment soon after receiving mental health services despite failing three times in the previous year. The situation suggests the mental health services helped her get sober. In any event, it is not TH's burden to show they did. Second, our legislature found:

> [P]rior state policy of addressing mental health and chemical dependency in isolation from each other has not been cost-effective and has often resulted in longer-term, more costly treatment that may be less effective over time. The legislature finds that a substantial number of persons have co-occurring mental and substance abuse disorders and that identification and integrated treatment of co-occurring disorders is critical to successful outcomes and recovery.

LAWS OF 2005, ch. 504, § 101. DSHS failed to tailor TH's services to her co-occurring problems; the services were not integrated. As TH argues, her attachment-relationship with SJ might not have deteriorated if she had earlier completed treatment.

¶20 TH next contends DSHS failed to provide necessary bonding-and-attachment services, even though the State acknowledged a lack of attachment and bonding was preventing TH from effectively caring for SJ. The State now speculatively argues TH could not have benefitted from bonding-and-attachment services. Even so, the State presented testimony tending to show its (incorrect) belief that TH was receiving bonding-and-attachment services at the YWCA. Further the State responds TH had not complained about the services at the YWCA and the provider wanted to

save TH additional travel time. These arguments are not well taken.

¶21 Though the YWCA parent educator testified TH was unable to read SJ's emotional cues and struggled with setting limits with him, she acknowledged she did not have any idea why TH was not progressing in terms of recognizing SJ's emotional needs. She related she did not know whether TH and SJ had ever been assessed for purposes of attachment and that she did not work on bonding and attachment with them. Likewise, Ms. Thomas testified TH did not provide behavioral or emotional control or guidance to SJ. Ms. Thomas related she did not know the source of TH's relationship problems with SJ. DSHS's role was to identify the problem. Ms. Thomas testified she had successfully worked on attachment problems with other families.

¶22 Moreover, the record showed TH applied the suggested parenting skills and attempted to control SJ's behavior but was met with unusually strong controlling and aggressive behavior from SJ. It was DSHS's role to work with SJ to reduce this unusual behavior, not TH's role to counteract SJ's new controlling and aggressive behaviors related to his detachment from TH during his bonding with the foster parents while in state care. Importantly, the record shows TH and SJ were attached at the initiation of the dependency. Ultimately, it was DSHS's responsibility to identify the services TH and SJ needed and provide them. It identified attachment and bonding as a "major issue" and failed to provide bonding-and-attachment services. RP (Mar. 13, 2007) at 455.

¶23 In sum, TH cured the deficiencies triggering the State's removal of SJ, unsanitary living conditions and drug use, and she established the required safe, clean, and drug-free home. When the dependency was initiated TH and SJ shared a bond and attachment that diminished over time as SJ became bonded with his foster parents. SJ became detached from TH as he bonded with his foster parents. The State failed to timely provide TH mental health services while she struggled with her drug addiction.

TH was unable to restore her relationship with SJ even though she attempted to apply the parenting skills taught to her. The record shows TH maintained a relationship with her other children who did not exhibit SJ's unusual controlling and aggressive behaviors. TH was not provided bonding-and-attachment services for her and SJ even though the State acknowledged her need. We cannot say the services would have been futile. And, considering SJ's detachment from TH while in state care, when at the same time, TH awaited delayed services, placing the burden on TH to repair the detachment damage seems fundamentally unfair in a constitutional due process context. *See In re Dependency of K.N.J.*, 171 Wn.2d 568, 574, 257 P.3d 522 (2011). The trial court erred in finding that all necessary services had been provided.

¶24 Having so decided, we do not decide whether the trial court erred in deciding whether little likelihood remained for remedying conditions in the near future or whether continuation of the parent-child relationship would diminish SJ's prospects for early integration into a stable home. Finally, on remand, if termination should proceed, we direct the trial court to enter specific findings regarding TH's current fitness to parent under *In re A.B.*, 168 Wn.2d at 911. Based on this record we are unable to infer parental fitness. Termination of the parent-child relationship must be based on current parental unfitness. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 203, 108 P.3d 156 (2005). "RCW 13.34.180(1)[ ]implicitly requires evidence of current parental unfitness, and thus 'comports with the constitutional due process requirement that unfitness be established by clear, cogent, and convincing evidence.' " *In re A.B.*, 168 Wn.2d at 919 (quoting *In re Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995)).

¶25 Reversed and remanded for action consistent with this opinion.

KULIK, C.J., and SWEENEY, J.

Reconsideration denied September 21, 2011.