FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

2018 JUL 23 AM 10: 15

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| In Matter of Dependency of R.M.R., date of birth: 04/03/11, | ) ) ) |
| Minor Child. | ) ) |
| WASHINGTON STATE DEPARTMENT OF SOCIAL & HEALTH SERVICES, | ) ) ) |
| Respondent, | ) ) |
| v. | ) ) |
| GERALD G. GOTCHER, | ) ) |
| Appellant. | ) ) ) |

No. 77192-2-I

UNPUBLISHED OPINION

FILED:  July 23, 2018

VERELLEN, J. — After a dependency of five-and-a-half years, the juvenile court terminated the parental rights of the appellant father to his six-year-old daughter.  Shortly after his daughter's first birthday, the father stopped participating in her dependency proceeding.  He moved to another city, stopped visiting his child, and did not complete any of the court-ordered services.  He had no contact with his daughter for more than five years.  Despite his efforts shortly before trial to reengage in the proceeding, substantial evidence supports the court's findings that the father is currently unfit to parent his child and the Department of Social & Health Services (Department) offered all necessary and

reasonably available services capable of correcting parental deficiencies in the near future. We affirm.

## FACTS

Gerald Gotcher and R.M.R.'s mother[1] married around the time of R.M.R.'s birth in 2011. Gotcher's name is listed as the father on R.M.R.'s birth certificate. Gotcher has an older child who resides with her mother in California. Gotcher's older child has never lived with him, but he has telephone contact with her and provides occasional financial assistance to her.

The Department became involved with the family at the time R.M.R. was born and offered some medical and public health services to the mother. The Department took custody of R.M.R. when she was five months old, after the mother entered a substance abuse treatment program and Gotcher was unable to care for the infant on his own. After the Department took R.M.R. into protective custody, Gotcher and the mother moved to Portland, Oregon to live with family. The Department placed R.M.R. in licensed care nearby in Vancouver, Washington. R.M.R. has remained in the same foster care placement throughout the dependency except for a period of approximately one year, in 2015, during a failed attempt to reunite R.M.R. with her mother.

When she was placed in licensed care as an infant, R.M.R. was underweight, had poor muscle tone, crossed eyes, and was unable to tolerate

---

[1] R.M.R.'s mother entered into a stipulated open adoption agreement and termination order.

being held or fed normally. She appeared to have some developmental delays. However, R.M.R. made progress quickly and, within seven months, she was developmentally on track.

In December 2011, the court entered an agreed order of dependency for R.M.R. as to Gotcher. The stipulated statutory basis for the dependency was the absence of a parent capable of providing adequate care for R.M.R. The agreed factual basis included the parents' abandonment of R.M.R., Gotcher's criminal history, lack of stable housing, and urinalysis test results indicating his use of marijuana and alcohol. The agreed-upon dispositional provisions required Gotcher to (1) obtain a drug and alcohol evaluation and follow all treatment recommendations, (2) participate in twice-weekly random urinalysis testing, and (3) obtain a parenting assessment and follow all recommendations. The dependency order also provided for supervised visitation with R.M.R. three times per week.

In the beginning, Gotcher actively participated in the dependency, and for the first few months, he consistently visited R.M.R. Gotcher obtained a drug and alcohol evaluation which did not recommend substance abuse treatment contingent on Gotcher's successful completion of 90 days of urinalysis testing. He also obtained a psychological evaluation. The psychologist recommended that Gotcher complete an anger management assessment and follow the recommendations based on that assessment, participate in parenting classes, continue random urinalysis while his daughter remains in state custody, and

maintain stable employment. Gotcher engaged in some urinalysis testing but did not complete the required 90 days.

Gotcher testified that just after R.M.R.'s first birthday, the mother informed him that he was not the child's father, and the couple separated. In June 2012, Gotcher visited R.M.R., and the visitation supervisor asked him to leave because he smelled of alcohol and appeared to be under the influence. This was the last time Gotcher saw R.M.R. Shortly after this incident, the social worker assigned to the case arranged a meeting with Gotcher in Portland. During the meeting, Gotcher told the social worker that he did not have stable housing or income. He mentioned that he was considering relocating to the Seattle area. The social worker urged him to maintain contact with her and let her know where he was living.

Gotcher moved to the Seattle area shortly after this meeting. He did not contact the Department to provide new contact information, request referrals for services in his new area, or request visits with R.M.R. The social worker was unable to reach Gotcher.

In 2013, a social worker who took over the case while a colleague was on medical leave successfully reached Gotcher using a new telephone number provided by R.M.R.'s mother. The social worker introduced himself, provided his contact information, and requested permission for the foster parents to travel with R.M.R. Gotcher did not ask about services or visits. When the social worker later tried to contact Gotcher again, the telephone number was no longer in service.

Eventually, at the end of 2013, the social worker conducted a jail search and learned that Gotcher was confined in the Snohomish County jail. Gotcher pleaded guilty to assault in the third degree in November 2013 based on a stabbing incident and was sentenced to eight months in jail.

The court appointed special advocate (CASA), who was appointed to the case in 2011, visited both parents in Portland early on in the case. However, the CASA was unable see Gotcher again until she visited him in jail in Snohomish County at the end of 2013. At that time, when the CASA tried to discuss services, Gotcher became angry because he believed he had completed all the required services and thought that R.M.R. should be placed in his care upon his release. Gotcher told the CASA that he planned to rent a room in Everett after his release. The CASA left her contact information for Gotcher and the contact information for his attorney. Gotcher agreed to get in touch with the CASA when he was released so they could review the status of his services. But Gotcher did not contact the CASA and she did not see him again until they met in court more than three years later.

The child support division sent notices to Gotcher starting in 2011 regarding his child support obligation. Gotcher did not pay any of the child support for R.M.R. and, by the time of trial, he had been assessed over $15,000 in back support. Eventually, in 2016, Gotcher called and reported to the support enforcement officer that he did not know if he was R.M.R.'s father and indicated that he wanted paternity testing.

In the meantime, a new social worker was assigned to R.M.R.'s case in 2015. She did not know Gotcher's whereabouts and attempted to contact him using the information in the file and through his attorney. Then in October 2016, around the time of Gotcher's contact with the child support division, Gotcher called the social worker and indicated that he wanted to pursue deoxyribonucleic acid (DNA) testing. He explained that he had been inactive in the dependency case after the mother told him he was not R.M.R.'s father. The DNA testing Gotcher requested was scheduled in November 2016. R.M.R. was swabbed for a DNA test, but Gotcher did not keep his appointment. The social worker provided information to Gotcher about resources for services and made referrals for an anger management assessment, a new drug and alcohol evaluation, and parenting classes. The social worker also sent service letters to Gotcher's current address to remind him of the dependency order's requirements.

In January 2017, the Department filed a petition to terminate parental rights. Gotcher and the social worker spoke again in March 2017 about referrals for services. He did not ask to visit R.M.R. After meeting the CASA again in court in 2017, Gotcher had several conversations with her about services available in his area.

Sometime around May 2017, a month before the termination trial, Gotcher requested visitation with R.M.R. He was frustrated by initial logistic delays in organizing the visits. On May 31, Gotcher sent an e-mail message to the social worker explaining that it was critical for him to restart visits before the upcoming

trial to "avoid" an argument that he had no recent contact with R.M.R. He also suggested that it would be a "good idea" to move R.M.R. to a foster care placement that was closer to him in order to facilitate visits.

While the Department was initiating the process for Gotcher's visits, R.M.R.'s foster parents expressed concerns to the social worker that visitation between R.M.R. and Gotcher would be traumatic and harmful to the child. R.M.R. had experienced difficulties following the failed reunion with her mother and had been referred for mental health counseling. She had been diagnosed with adjustment disorder with anxiety. The social worker spoke to R.M.R.'s counselor. The counselor believed that in light of the challenges R.M.R. experienced when she was separated from her foster parents and placed with her mother, any reintroduction to Gotcher should be slow and gradual and done in conjunction with supportive services such as family therapy. Based on her conversations with the foster parents and the counselor, the social worker decided to suspend the process of setting up visitation.

The trial took place over four days in June 2017. R.M.R. was six years old and about to enter first grade. She had not seen Gotcher in five years and had been out of his care almost six years. Gotcher testified that for approximately four years, he had been living in a house in Granite Falls, Washington with his girlfriend, her five children, and her father.[2] Gotcher said that after he moved to

---

[2] Gotcher testified that he and R.M.R.'s mother were still legally married.

the Seattle area, he had no idea how to contact the social worker or anyone else involved in the case.

At the time of trial, Gotcher was actively participating in some court-ordered services but had yet to complete them. He was taking parenting classes. The week before the trial, he completed an anger management/domestic violence assessment. The evaluator recommended that Gotcher complete three months of moral reconation therapy due to his elevated score on a domestic violence inventory.[3] The evaluator acknowledged that if he had been aware that Gotcher's 2013 assault involved stabbing someone multiple times, he would have also recommended a psychological evaluation because the incident suggested a "rage component" that required something "way beyond anger management."[4] Gotcher did not engage in moral reconation therapy nor did he obtain an updated drug and alcohol evaluation. He began urinalysis testing again but only completed three tests, which did not encompass testing for alcohol.

The CASA testified that Gotcher never asked about R.M.R. in his conversations with her. She questioned his ability to parent his daughter due, in part, to his anger issues and history of assaults. The CASA pointed out that Gotcher had not demonstrated an ability to meet R.M.R.'s needs because he does not know her needs and had shown little interest in learning about her. She opined that Gotcher lacked empathy and an understanding of R.M.R.'s

---

[3] According to the record, as least one of Gotcher's prior assault convictions was a domestic violence offense.

[4] Report of Proceedings (RP) (June 20,2017) at 191.

circumstances, as demonstrated by his suggestion that the Department should remove her from the only stable home she has known to make visitation easier for him and his position that he could take custody of her immediately upon making some adjustments to the household's sleeping arrangements. According to the CASA, R.M.R. understood the concept of a permanent home and had consistently expressed her desire for a "forever home" since she was three or four years old. The CASA believed that R.M.R. had already waited too long for a permanent and stable home.

According to the social worker assigned to the case at the time of trial, reuniting R.M.R. with Gotcher in the foreseeable future was not realistic considering Gotcher's unresolved anger issues and lack of relationship with R.M.R. The social worker said that in order to determine if and when a reunion could happen, Gotcher would need to successfully complete anger management treatment, obtain an updated drug and alcohol evaluation, and successfully complete urinalysis testing for a sustained period of time. Most importantly, he would need to demonstrate the commitment and ability to be a parent to R.M.R. in light of his prolonged absence from her life. She estimated that the process of completing services and developing a relationship with his daughter would take at least six months or a year, or longer, given R.M.R.'s diagnosis of anxiety, a time frame that is not within the foreseeable future for R.M.R. The social worker also had concerns about the practicality of placing R.M.R. in Gotcher's care given his

testimony that he regularly works six days per week in a tattoo parlor, from noon until midnight or later.

After considering the testimony of 11 witnesses and approximately 30 exhibits, the court entered numerous findings of fact and conclusions of law and an order terminating Gotcher's parental rights. He appeals.

ANALYSIS

Under the termination statutes, the juvenile court may order termination of parental rights if the State proves the six statutory elements of RCW 13.34.180 by clear, cogent, and convincing evidence and the court finds that termination is in the child's best interests.[5] Only one of the six statutory elements under RCW 13.34.180(1) is at issue in this appeal:

> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.[6]

---

[5] RCW 13.34.190; In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

[6] The other statutory elements are "(a) That the child has been found to be a dependent child; (b) That the court has entered a dispositional order pursuant to RCW 13.34.130; (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency; . . . (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; and (f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. RCW 13.34.180(1).

In addition to proving the statutory elements, due process requires the court to "make a finding of current unfitness before parental rights can be terminated."[7] "Satisfying all six of the statutory elements raises an implied finding of parental unfitness."[8]

Clear, cogent, and convincing evidence is evidence that shows the ultimate fact at issue to be highly probable.[9] We give deference to the trial court in weighing the evidence and witness credibility.[10] "The court's factual findings must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence."[11] Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the fact at issue.[12]

Gotcher contends that the Department failed to offer all necessary and reasonably available services, such as structured or therapeutic visitation or attachment services, that would have allowed him to build a relationship with R.M.R. and ultimately to reunify with her. He also challenges the court's finding of parental unfitness.

---

[7] In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016).

[8] Id.

[9] K.S.C., 137 Wn.2d at 925.

[10] In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

[11] K.S.C., 137 Wn.2d at 925.

[12] In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011).

Read as a whole, it is clear that the court's finding of unfitness hinges on the fact that Gotcher "simply chose not to be involved in his daughter's life."[13] Gotcher has not lived with R.M.R. since she was five months old, and he has not seen her since she was a year old. She does not know him. We defer to the court's finding that Gotcher was not credible when he claimed that he was uninvolved in the dependency for five years because he did not know how to contact the Department. His conduct manifested a lack of commitment to parenting R.M.R., and as the court observed, his explanation is belied by the fact that after he reached the social worker in October 2016, he lost interest "almost immediately" and did not respond again to the Department's attempts to engage him until months later, March 2017.[14]

The record also supports the court's finding that Gotcher lacks insight into his daughter's needs and has unaddressed anger issues. He demonstrated a lack of concern for his daughter by suggesting that the Department remove her from her long-term foster care placement for his convenience. And, as the court noted, Gotcher's testimony that R.M.R. could be placed in his care within 24 hours reveals his lack of knowledge about her needs and about the lengthy process that would be required to carry out a hypothetically possible transition to his care. Since the dependency was established in 2011, Gotcher has been convicted of assault based on a stabbing incident, and he has not engaged in moral reconation

---

[13] Clerk's Papers (CP) at 240 (Finding of Fact 2.7.7).
[14] Id.

therapy nor any other treatment directed toward his propensity for anger and violence. Substantial evidence in the record supports the court's findings that Gotcher was currently unfit to parent his daughter.

Substantial evidence also supports the finding that the Department offered all necessary and reasonably available services capable of correcting his parental deficiencies within the foreseeable future. The Department offered all court-ordered services to Gotcher. He undertook some but not all of the services required. As noted, he did not begin the treatment recommended to address his anger, did not obtain updated evaluations, or complete the recommended urinalysis testing. While Gotcher claims that the Department unjustifiably withheld visitation without concrete evidence that it would cause distress or harm to R.M.R., he ignores the fact that he did not ask to resume visits with his daughter until the month before trial. The evidence supports the court's finding that any transition would be a long and gradual process and, even if successful, there was a strong possibility of adjustment problems that would require up to six months of therapy. According to the social worker's estimate, the process of completing services and establishing a relationship with R.M.R. would take at least six months to a year, if not longer, given R.M.R.'s prior experience and diagnosis of anxiety.

Although Gotcher assigns error to several findings, his briefing focuses of the court's finding drawing upon similarities between this case and the circumstances in K.M.M. Gotcher contends that the court's reliance on K.M.M. is misplaced. The court found:

13

> As with the father in In re Matter of K.M.M., 186 Wn.2d 466, 379 P.3d 75 (2016), Mr. Gotcher has no existing parent-child relationship with [R.M.R.]. When looking [at] parental deficiencies, best interest analysis and current unfitness, the court looks at the needs and circumstances of the specific child before the court. The father made a conscious decision to drop out of her life. There is no service capable of correcting that severed relationship in [R.M.R.'s] near future.[15]

First, Gotcher's claim that the Department was required to facilitate visitation fails because, while undeniably important for reunification, it is well settled that visitation is not a service for the purposes of proving RCW 13.34.180(1)(d).[16] The statute's reference to "services" required under RCW 13.34.136, includes "'domestic violence counseling, parenting classes, drug and alcohol counseling,'" random urinalysis, and other similar services.[17] Visitation, on the other hand, is not rehabilitative in and of itself. Nor is this a situation "where visitation is part of a required service," such as an interactive parenting class.[18] As the court recognized, Gotcher's decision after June 2012 to "make himself a stranger" to his daughter created a barrier to any possible reunification with her in the foreseeable future.[19] This unfortunate circumstance does not transform visitation into a service the Department was required to provide in order to meet its burden under RCW 13.34.180(1)(d).

---

[15] CP at 240 (Finding of Fact 2.7.9).

[16] In re Dependency of T.H., 139 Wn. App. 784, 791-92, 162 P.3d 1141 (2007).

[17] Id. at 791 (quoting In re Dependency of A.A., 105 Wn. App. 604, 608-09, 20 P.3d 492 (2001)).

[18] Id. at 792.

[19] CP at 241 (Finding of Fact 2.10).

Second, Gotcher fails to demonstrate any error with respect to the decision in K.M.M. There, the court held that where there was no bond between the parent and child at the time of trial and that there was no service capable of remedying that condition within the child's foreseeable future, the parent was currently unfit and the Department had met its obligation to offer all necessary and reasonably available services capable of correcting parental deficiencies within the foreseeable future.[20] The court explained that the absence of attachment to a parent is a condition that interferes with a parent's ability to provide for a child's health, safety, and well-being and may ultimately render a parent unfit.[21]

Here, too, Gotcher acknowledged that he had no existing relationship with his six-year-old child at the time of trial. But Gotcher points out that the Department declined to arrange visitation for him in 2017, whereas the Department suspended visitation in K.M.M. only after there were demonstrably adverse effects on the child.[22] He fails to recognize, however, that even if the Department had arranged for him to visit R.M.R. in the weeks before the trial, this would not have changed the fact that Gotcher had been absent for the preceding five years of his young child's life and, as a result, he had no existing bond with her.

In K.M.M., the court concluded that even if the parent-child attachment could be restored at some point in future, there was nothing in the record to indicate that such restoration could be accomplished within a time frame that

---

[20] K.M.M., 186 Wn.2d at 487, 494.

[21] Id. at 493-94.

[22] Id. at 475.

would be "conducive to K.M.M.'s emotional development and well-being."[23] Likewise here, the record supports the court's determination that the time that would be required for Gotcher to address his anger issues, to establish a parent-child relationship, and to allow for a "hypothetically possible gradual transition" to his care would be "well beyond the near future for this 6 year-old child."[24] The facts critical to the court's holding in K.M.M. are analogous to the facts here.

In contrast, the facts are significantly different from those present in In re Parental Rights to B.P., where the court reversed an order of termination because the Department failed to offer or provide bonding and attachment therapy for the mother and her five-year-old child.[25] There, the mother was successfully addressing her drug addiction, had custody of a younger child, and the State conceded that she was a fit parent to the younger child. The mother was also having regular, consistent visitation with B.P. and the visits were going well. The only question was whether B.P. could psychologically detach from her foster parents and attach to her mother as her primary caregiver. In reversing the termination order, the court observed that there was no evidence to suggest that the Department withheld bonding and attachment services because "those services would have failed or taken too long."[26] But here, Gotcher had no contact with his child for more than five years. The record supports the court's conclusion

---

[23] Id. at 487.

[24] CP at 240 (Finding of Fact 2.7.8).

[25] 186 Wn.2d 292, 376 P.3d 350 (2016).

[26] Id. at 318.

that any service capable of restoring the parent-child relationship simply would have taken too long.

In sum, substantial evidence supports the trial court's findings that the Department offered all necessary and reasonably available services to Gotcher and that he was currently unfit to parent R.M.R. By the time of trial, Gotcher's daughter had been out of his care for virtually her entire life, and he had failed to fulfill any parental responsibilities for many years. His belated interest in becoming involved in R.M.R.'s life in the months before trial was insufficient to demonstrate true motivation and commitment to parenting. The Department's unwillingness to facilitate visitation in 2017 was not the reason for the nonexistence of a parent-child relationship. There was nothing the Department could have done in May or June of 2017 to remedy the lack of a relationship or to resolve parental deficiencies to allow reunification within the near future.

Affirmed.

WE CONCUR:

_Mann, ACJ_

_Becker, J._