**FILED**
**DECEMBER 21, 2021**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No. 38074-2-III |
| R.S. | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, A.C.J. — The parental rights of the father of now-four-year-old R.S.

were terminated in February 2021. The father appeals, challenging the termination on

only one ground: that the trial court erred in finding that continuation of his parent-child

relationship diminished R.S.'s prospects for a stable and permanent home. He contends

that the foster parents are providing a stable home and will probably adopt R.S. even if the father is given more time and fails to address his parental deficiencies. This court has rejected this argument before, and it fares no better here. We affirm.

FACTS AND PROCEDURAL BACKGROUND

In August 2018, the Washington State Department of Children, Youth, and Families (Department) received an anonymous report that R.S., then 15 months old, had ingested heroin. The next day, Department personnel met with his parents, who admitted being daily drug users but denied that R.S. had ingested heroin.

According to a dependency petition filed by the Department three months later, it arranged for a UA[1] test for both parents and provided a gas card to help with transportation costs, but neither parent appeared for the appointment. Within a week of their initial meeting with Department representatives, the parents failed to attend a scheduled family team meeting and no longer answered calls.

The next month, the father was arrested and booked into jail for possession of a controlled substance (morphine), criminal trespassing, resisting arrest, and possession of a controlled substance (tramadol). During his incarceration, both parents agreed that R.S. could be placed in out-of-home care. The father pleaded guilty to criminal trespass and possession of a controlled substance (morphine) and was released on October 5, 2018. He only visited with R.S. once, on October 11, 2018. The Department provided him with

---

[1] Urinalysis.

a phone and prepaid minutes to arrange further visits and testing but the father never called.

The Department filed a dependency petition at the end of November 2018. While the father appeared for a shelter care hearing in early December and agreed to engage with services, he never followed through. He did not appear for the dependency hearing that took place in March 2019. The court entered an order of dependency by default against the father, and R.S. was placed into foster care.

The father did not attend dependency review hearings or respond to correspondence. The Department continued to refer him to UAs, but he did not appear for any testing.

In April 2020, the Department petitioned to terminate both parents' parent-child relationship with R.S. The father was personally served with the petition in June 2020. He requested a lawyer and one was appointed.

The termination trial took place in February 2021. R.S.'s mother had defaulted on the termination issue months earlier and was not expected to be present. The father's lawyer was present, but the father failed to appear. The lawyer defended the father but offered no excuse for his absence.

The State called three witnesses. The Child Protective Services (CPS) investigator who responded to the initial anonymous report testified to that report, the father's admission of drug use, the father's arrest, his failure to engage in court-ordered services,

3

and his one and only visit with R.S. in October 2018. Lisa Elliott, a Department social worker who began working with R.S. in November 2020, testified to the Department's efforts to try to locate and contact the father during the course of the case, and about R.S.'s care following his placement outside the home. The guardian ad litem, who had been appointed in June 2019, testified to her observations during regular visits to the foster parents' home.

Ms. Elliot testified that once dependency was ordered, R.S. never returned to the care of either parent. He was initially placed with a foster family. At the first dependency review hearing in May 2019, he was ordered placed in relative care with a maternal great-aunt and uncle. At a permanency planning hearing taking place in September 2019, however, he was ordered returned to foster care, and he was returned to his original foster family. March 2020 was identified as the projected date for placement for adoption. R.S. remained with the same foster family thereafter. By the time of the termination hearing, R.S.—not yet four years old—had been with his foster family for over two years.

Relevant to the father's assignment of error on appeal, Ms. Elliot expressed her opinion about continuing the parent-child relationship:

Q     In your opinion is it—is it—well, will either of the parents be able to correct their parental deficiencies in the near future?
A     No.
Q     Why do you think that?

A       Substance use treatment takes at least—you have to go through detox, six to nine months of intensive inpatient or outpatient treatment, and then usually a number of months transitioning into a normal lifestyle.  So, it takes over a year for most people to correct those issues.

Q       And what do you think would be the near future for [R.S.]?

A       [R.S]'s going to be four in May.  So, six months is the near future for him.  He's spent over two-thirds of his life in foster care, and he deserves permanency.

Q       In your opinion, does continuing the parent/child relationship diminish [R.S.]'s prospects for early integration into a stable and permanent home?

A       Yes.

Q       What makes you say that?

A       At this point [R.S.] doesn't have any concrete memories, I would believe, of his parents.  He talks about his first daddy and his tummy mommy.  But, he now refers to his foster parents as his father and mother.  And he understands that his life is different than other children.  But, he is very bonded and attached to his foster family, and they are willing to provide him permanency.  And they are some of the most exceptional people you'll ever meet.

Q       Okay.  Do you believe that termination of parental rights is in the best interests of [R.S.]?

A       I do.

Q       And, anything more that you want to say about why that is?

A       Just the length of time the parents have abandoned this child to our system.  He has found a new home and people who love him and will provide him with the best possible life.  And that's why it's in his best interest to be legally free.

Report of Proceedings (RP) at 34-35.

The guardian ad litem testified similarly, stating that R.S. was "doing really, really well.  He's just blossoming, and he's really fun.  And he seems like his development is

5

right on target. And, I think he's very happy in his placement." RP at 49. She noted

significant improvements to his speech, cognition, and emotional capacity while in foster

care. Asked what she thought was "in [R.S.]'s best interests moving forward," she

answered, "I think he needs to be adopted in a permanent home, the one he's in right

now." RP at 49. Asked why, she answered:

> Over the—the time that I've . . . been assigned to this case, . . . I don't see
> any indication that either parent is either in a place to reinvolve themselves
> in . . . [R.S.]'s life or able to. I don't think they're—either one is able to
> provide the kind of home and care that [R.S] needs . . . in the long term.

RP at 49.

The defense called no witnesses, but in closing argument, defense counsel pointed

to the father's incarceration and a lack of contact in arguing that some of the statutory

factors required to support termination had not been proved. As to RCW 13.34.180(1)(f),

the factor at issue on appeal, she argued:

> The last condition is that the continuation of the parent/child relationship
> clearly diminishes the child's prospect for early integration—focus on those
> words—into a stable and permanent home. We've already determined that
> that's not the case. *He is in a stable and permanent home. As the
> Guardian Ad Litem had testified, current foster parents are planning on
> keeping him, planning on doing an adoption. So, if* [*the father*] *was able to
> come in, able to do intensive outpatient, and start having reunification
> visits, there is nothing that would diminish* [R.S.]*'s prospect of remaining in
> the home if that did not succeed.*

RP at 58-59 (emphasis added). Defense counsel concluded by asking "that the dependency continue" and that the Department "reach out[,] . . . engage my client . . . and attempt to make efforts to engage him in services." RP at 59-60.

The trial court orally announced its decision to terminate the father's parental rights. It spoke at length about the Department having fulfilled its obligations and the father having done virtually nothing in response. It complimented the father's lawyer on her vigorous representation, but observed that her client was

> not even in court today to tell—tell the Judge that, hey, I—if I was clean, if
> I was sober, and if I complied with the Court's order, I should someday
> have [R.S] back. Well, he's not here to—he's not here. So, that just tells
> the Court that he doesn't care.

RP at 63. The trial court characterized R.S.'s father and mother as "abandon[ing] him, I guess you call it, to the system." RP at 65. It concluded by addressing the foster parents, who were present, saying, "Thank you very much for your love and affection for this boy that needs and finally does have a permanent home." RP at 71.

Findings of fact, conclusions of law and an order terminating the parent-child relationship were thereafter entered. The father appeals.

## ANALYSIS

The father assigns error on appeal to only the sufficiency of the evidence to support the essential criteria in RCW 13.34.180(1)(f) that continuation of the parent-child relationship diminished R.S's prospects for a stable and permanent home. He reprises his

trial lawyer's argument that since R.S. was doing well with his foster family, he *had*

stability, and continuing the father's parental rights would not diminish R.S.'s ultimate

prospects for a stable and permanent home.

Washington statutes provide a two-step process to satisfy the due process required

before the State can terminate a parent's fundamental interest in the custody, care, and

companionship of their children. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d

1104 (2010).[2] At issue in this appeal is the first step, in which the State must prove six

statutory elements, provided by RCW 13.34.180(1), by clear, cogent, and convincing

evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999).[3] "The

court's factual findings must be upheld if supported by substantial evidence from which a

rational trier of fact could find the necessary facts by clear, cogent, and convincing

---

[2] Parents have a fundamental liberty and property interest in the care and custody of their children. U.S. Const. amends. V, XIV; Wash. Const. art. I, § 3; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 559 (1982). "The due process clause of the Fourteenth Amendment protects a parent's right to the custody, care, and companionship of [his or] her children." *In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). "Due process requires a court to find the parent to be currently unfit before the parent-child relationship may be terminated." *In re Parental Rights to K.J.B.*, 187 Wn.2d 592, 597, 387 P.3d 1072 (2017).

[3] "Satisfying all six of the statutory elements raises an implied finding of parental unfitness." *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 479, 379 P.3d 75 (2016). In a second step not at issue in this appeal, the State must prove by a preponderance of the evidence that the termination of parental rights is in the best interest of the child. RCW 13.34.190; *A.B.*, 168 Wn.2d at 911.

evidence." *Id.* Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the matter asserted. *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 162 P.3d 470 (2011).

The father argues that the State failed to prove the sixth statutory element, provided by RCW 13.34.180(1)(f), that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." The same argument was made by a parent—a mother—in *In re Dependency of A.D.*, 193 Wn. App. 445, 376 P.3d 1140 (2016). She argued that "because her children were already in a stable placement, maintaining her legal relationship to them had no impact." *Id.* at 457.

As the appellate court observed in *A.D.*, the sixth statutory factor "'is mainly concerned with the continued effect of the legal relationship between parent and child, as an obstacle to adoption.'" *Id.* at 458 (emphasis omitted) (quoting *In re Dependency of A.C.*, 123 Wn. App. 244, 250, 98 P.3d 89 (2004)). The State is not required to prove the child will be adopted. *In re Welfare of R.H.*, 176 Wn. App. 419, 428, 309 P.3d 620 (2013). The State can prove the sixth factor by showing that "'a permanent home exist[s] but the parent-child relationship prevents the child from obtaining that placement,'" however. *A.D.*, 193 Wn. App. at 458 (alteration in original) (quoting *R.H.*, 176 Wn. App. at 428). And evidence of a prospective adoptive home is material to the factor. *R.H.*, 176 Wn. App. at 428.

As explained by the court in *A.D.*, the mother's argument that a stable and permanent foster home was already available to her children "addresses only the stability of [the children's] placement, not its permanence. Although their foster home may have been *stable*, it is, by definition, temporary." 193 Wn. App. at 458 (citing RCW 13.40.020(12)).[4] RCW 13.34.180(1)(f) is satisfied by the State showing that but for the legal relationship between parent and child, there is a high probability that the child could find a permanent adoptive home. *Id.*

The evidence in this case that continuation of the father's parent-child relationship diminished R.S.'s prospects for a permanent home includes testimony from the CPS investigator and Ms. Elliott establishing that permanency for R.S. had already been delayed for over two years by the father's failure to stay in contact and engage in services.

---

[4] The argument that the sixth statutory factor is not proved if a child is in a stable placement with foster parents unlikely to give up on adoption has been rejected in other unpublished decisions of this court that viewed *A.D.* as controlling, as we do. *See In re Dependency of L.A.H.*, No. 81456-7-I, slip op. at 19 (Wash. Ct. App. May 10, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/814567.pdf (rejecting argument that the factor was not proved if a child's placement or adoption prospect would not be in jeopardy if termination did not occur at the time of trial); *In re Dependency of M.H.*, No. 78916-3-I, slip op. at 12 (Wash. Ct. App. June 17, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf /789163.pdf (rejecting argument that the factor was not proved if child is in a stable placement with caregivers willing to continue to care for her even if parental rights are not terminated). Unpublished decisions have no precedential value, are not binding on any court, and are cited only for their persuasive value. *See* GR 14.1.

10

It includes five review hearing orders reflecting the fact that the permanency plan for R.S. was adoption beginning in September 2019, with an original projected date for placement for adoption of March 2020 that was later extended to December 2020 and May 2021.  *See* Ex. 8, at 8, 13, ¶¶ 2.23, 3.22 (Permanency Plan. Hr'g Ord., Sept. 19, 2019); Ex. 9, at 8, 13, ¶¶ 2.23, 3.22 (Permanency Plan. Hr'g Ord., Oct. 17, 2019); Ex. 10, at 8, 13, ¶¶ 2.23, 3.22 (Dependency Rev. Hr'g Ord., Mar. 5. 2020); Ex. 11, at 8, 13, ¶¶ 2.23, 3.22 (Permanency Plan. Hr'g Ord., June 22, 2020); and Ex. 13, at 8, 13, ¶¶ 2.23, 3.22 (Dependency Rev. Hr'g Ord. dated Nov. 19, 2020).

Finally, it includes Ms. Elliott's testimony that R.S. had been with his foster family for over two years, that he was "very bonded and attached" to the family, that the foster parents (who attended the termination trial) "are willing to provide him permanency," and that it was in R.S.'s "best interest to be legally free."  RP at 35.  It includes testimony of the guardian ad litem that she believed R.S. "needs to be adopted and in a permanent home, the one he's in right now."  RP at 49.

Substantial evidence supports the trial court's findings, which support its conclusion of law that the element of RCW 13.34.180(1)(f) was met and proven by clear, cogent, and convincing evidence.

No. 38074-2-III
*In re Parental Rights to R.S.*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, A.C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Staab, J.

12