# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of:

J.J.S.,

Minor Child.

DIVISION ONE

No. 82512-7-I

UNPUBLISHED OPINION

DWYER, J. — J.S. appeals from an order terminating her parental rights to her biological child, J.J.S.  J.S. contends that the trial court erred in finding that all services ordered were expressly and understandably offered and provided.  Because substantial evidence supports the trial court's factual finding, we affirm.

I

J.S. is the biological mother of J.J.S., who was born in 2016.  When J.J.S. was one year old, his biological father[1] assaulted J.S. and forcibly removed J.J.S. from J.S.'s home.  The police located J.J.S. at his paternal grandmother's home, but decided not to return him to J.S. because officers became concerned by her limited response to learning that her son had been located, allegations made by the grandmother about J.S.'s drug use, and concerns about J.S.'s possible involvement in prostitution.  The Department of Children, Youth and Families (the

---

[1] The parental rights of J.J.S.'s biological father were terminated in February 2020.  Ex. 9.

Department) initiated dependency proceedings, and J.J.S. was placed with his paternal grandmother, with whom he has remained since March 2018.

J.S. entered an agreed-on dependency order in August 2018. The order required that J.S. participate in a parenting assessment, mental health counseling, and urinalysis testing. If J.S.'s urinalysis results continued to show levels of tetrahydrocannabinol (THC), J.S. was to complete a drug and alcohol assessment and follow treatment recommendations.

In November 2018, J.S. was referred to Dr. Carmela Washington-Harvey for a parenting assessment. J.S. met with Dr. Washington-Harvey in January 2019, but Dr. Washington-Harvey observed that J.S. "seemed to be under the influence of a drug" and was unable to complete the assessment. Dr. Washington-Harvey scheduled a follow-up appointment later that month and instructed J.S. to arrive sober. J.S. did not appear for the follow-up appointment. Neither did she appear for a third scheduled appointment.

The Department social worker also referred J.S. to mental health counseling. J.S. participated in mental health counseling between October 2018 and April 2019.

In August and September 2018, J.S. was referred to urinalysis testing, but did not appear for urinalysis collection. J.S. missed appointments for urinalysis collection in September, November, and December of 2018, and in January, March, April, May and June of 2019. During this time period, J.S. provided samples on four occasions, the results of which indicated that J.S.'s urine contained THC. Accordingly, J.S. was instructed to participate in a drug and

alcohol assessment and was given information about how to do so in February, March, and April of 2019. J.S. did not complete the drug and alcohol assessment.

J.S. was arrested in June 2019. The Department filed a termination of parental rights petition in October 2019. In February 2020, J.S. pled guilty to three counts of promoting prostitution in the first degree. She was sentenced to 41 months of confinement. While J.S. was incarcerated, the trial court conducted a dependency review hearing. At that hearing, the trial court found that the Department had made reasonable efforts to provide services to the family and had complied with the court order. The trial court also found that J.S. had not complied. The trial court reserved making a finding regarding progress toward correcting the problems that necessitated the child's placement in out-of-home care, noting that the "mother has been in custody for most of the review period. Services need to be referred in her new location." The Department social workers attempted to locate services at the facilities where she was housed. However, due to the COVID-19 pandemic, the Department of Corrections did not allow service providers to enter the facilities wherein J.S. was housed in order to provide services. In March 2021, a termination of parental rights trial took place in King County Superior Court. The trial court terminated J.S.'s parental rights.

J.S. appeals

II

J. S. contends that the order terminating her parent-child relationship with J.J.S. should be reversed because, she asserts, the Department failed to prove

3

that court-ordered services were expressly and understandably offered or provided while she was incarcerated. According to J.S., because the services at issue were "court-ordered" services, rather than "necessary" services, the fact that such services were "not reasonably available during mother's incarceration"[2] did not excuse the department from providing them. Because the trial court found that the services ordered under RCW 13.34.136 had been expressly and understandably offered, and substantial evidence supported this factual finding, we disagree.

"Parents have a fundamental right to the care and custody of their children, and a trial court asked to interfere with that right should employ great care." In re Welfare of M.R.H., 145 Wn. App. 10, 23, 188 P.3d 510 (2008). "[T]ermination of parental rights should be allowed 'only for the most powerful [of] reasons.'" In re Welfare of S.J., 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (internal quotation marks omitted) (quoting In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)). Pursuant to RCW 13.34.180(1) and RCW 13.34.190, Washington courts use a two-step process in determining whether to terminate parental rights. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). "The first step focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence. The second step focuses on the child's best interests and need be proved by only a preponderance of the evidence." A.B., 168 Wn.2d at 911 (footnotes

---

[2] Finding of Fact 2.12 (G).

omitted).  The second step is reached only if the first step is satisfied.  A.B., 168 Wn.2d at 911.

A trial court may terminate a parent-child relationship only if the Department proves, by clear, cogent, and convincing evidence, the six termination factors set forth in RCW 13.34.180(1).  M.R.H., 145 Wn. App. at 24.

One such factor requires the Department to prove that "the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided."  RCW 13.34.180(1)(d).  When the parent is incarcerated, the services ordered, "*where possible*, must include treatment that reflects the *resources available at the facility* where the parent is confined."  RCW 13.34.136(2)(b)(i)(A) (emphasis added).

"Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable.'"  In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).  When the trial court has weighed the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law.  In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990).  "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise."  In re Welfare of T.B., 150 Wn. App. 599, 607, 209

P.3d 497 (2009). The determination of whether the findings of fact are supported by substantial evidence "must be made in light of the degree of proof required." P.D., 58 Wn. App. at 25. When, as here, the quantum of proof required is clear and convincing, "the question on appeal is whether there is substantial evidence to support the findings in light of the highly probable test." P.D., 58 Wn. App. at 25. Moreover, we defer to the trial court's credibility determinations on appeal from an order terminating parental rights. T.B., 150 Wn. App. at 607.

Here, the trial court found that

[s]ervices ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

Finding of Fact 2.12.

The trial court explained that this finding was based on the following:

A. The mother was offered several services and concrete goods in 2017, prior to [the child's] removal. She was given clothing, a crib, and other items, and the Department referred her to Project Safe Care. Mother was also offered Family Voluntary Services and chemical dependency services but declined to participate. This is supported by the facts in the mother's agreed order of dependency (admitted as Exhibit 3).

B. The mother was referred to complete a parenting assessment with Doctor Carmela Washington-Harvey. Doctor Washington-Harvey testified at the trial and the court found her to be credible. She testified that mother came to the first appointment in January 2019, but she was unable to complete the testing because the mother appeared to be under the influence. Doctor Washington-Harvey testified the mother was not able to answer questions or participate effectively. She instructed the mother she needed to be sober for her next appointments. The mother had two subsequent appointments with Doctor Washington-Harvey; she no-showed to both appointments. Mother did not complete this service.

C. The mother was referred to complete 90 days of UAs. Exhibits 28-29 show that the mother no-showed to several urinalyses and that all samples she provided were positive for cannabinoids and THC. The Department offered this service but mother did not complete it. Mother's substance use is of continued concern.

D. The mother was referred to complete a drug and alcohol evaluation due to her THC and cannabinoid levels remaining high on her positive UAs. The mother testified she completed this evaluation, but this testimony was not credible. Mother could not say where she completed the evaluation or who did it. The social worker testified she reviewed the file and there is no drug and alcohol evaluation in the file. The mother did not complete this service.

E. The mother was referred to complete individual mental health counseling. Based on letters received from Youthcare (Exhibits 26-27), the mother was attending counseling at some point with Heather Post. Mother at first testified she did not recall this counseling, but later said she saw Heather Post while living in Youthcare until she moved out of there in 2018. Mother testified she saw a counselor named "Benjamin Johnson." She testified she told the social worker about him and signed a release of information, but the social worker testified she did not have a release or see any mention of him in the case file. Mother could not remember the last time she saw Benjamin Johnson. No evidence was presented to support mother's claim she was attending counseling regularly. Mother did not complete this service.

F. The mother testified she did have contact with social workers and discussed her services with them prior to incarceration. Exhibits admitted into evidence (numbers 32-48) show the mother received multiple service letters with clear instructions on how to access services, and that social workers discussed services and visitation with the mother via text as well. Mother did make some efforts to start services, which shows she knew how to access them.

G. After the mother's incarceration, the services available were more limited. The social worker made efforts to arrange for mother to complete services while incarcerated, however the Department of Corrections does not allow any providers into the institution due to the COVID-19 pandemic. Thus, the necessary services are not reasonably available during mother's incarceration.

7

Finding of Fact 2.12.

J.S. contends that the trial court erred because it did not explicitly find that the court-ordered services—a parenting assessment, random uranalysis testing, and mental health counseling—were impossible to provide while she was incarcerated. This is so, according to J.S., because court-ordered services are not subject to the "reasonably available" and "capable of correcting the parental deficiencies within the foreseeable future" limitations. J.S. argues, citing RCW 13.34.136(2)(b)(i)(A), that court-ordered services must be provided to incarcerated parents wherever possible.[3]

We disagree with appellant's contention. Regardless of whether it was possible to provide J.S. the ordered services while she was incarcerated, the trial court's factual findings, supported by substantial evidence in the record, indicate that J.S. was offered these services repeatedly and failed to avail herself of them on multiple occasions over more than six months. The trial court found that, prior to her incarceration, J.S. "received multiple service letters with clear instructions on how to access services" and "knew how to access them." Finding of Fact 2.12 (F). This finding was supported by J.S.'s own testimony at trial, which was that she was aware that she had received service letters with "instructions" regarding what she "was supposed to be doing." The trial court was not required to make any additional findings with regard to these services.

---

[3]RCW 13.34.136(2)(b)(i)(A) provides:
  If the parent is incarcerated, the plan must address how the parent will participate in the case conference and permanency planning meetings and, *where possible*, must include treatment that *reflects the resources available at the facility* where the parent is confined. The plan must provide for visitation opportunities, unless visitation is not in the best interests of the child.
(Emphasis added.)

Furthermore, the trial court's findings regarding the availability of services after J.S. was incarcerated make clear that it was not possible to offer J.S. services while she was incarcerated. The trial court found that "the Department of Corrections does not allow any providers into the institution due to the COVID-19 pandemic." Finding of Fact 2.12 (G). There is nothing in the record that suggests that these services were available in prison through telephone or video services or that anyone incarcerated in the facilities wherein J.S. was housed was provided with these services remotely. Even were we to accept J.S.'s argument that the Department was required to offer services "where possible," the Department was not obligated to provide services given that it was impossible to do so due to constraints entirely outside of its control.

Thus, the trial court's finding that "[s]ervices ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided" was supported by substantial evidence.

Affirmed.

_____
Dwyer, J.

WE CONCUR:

_____          _____
                                 Mann, C.J.