IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to<br><br>L.G.V. | No. 85404-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — After L.V. and her infant L.G.V. tested positive for methamphetamines, the Department for Children, Youth, and Families placed the child in licensed foster care. L.V. then repeatedly refused to participate in court-ordered services to address mental health concerns and chemical dependency, and her parental rights were terminated after a trial in May 2023. L.V. appeals, arguing that "all necessary services" were not understandably provided to her as required by the statute. Finding no error, we affirm.

FACTS

L.V. gave birth to L.G.V. on a sidewalk in Seattle on July 2, 2021. Law enforcement arrived at the scene and attempted to persuade L.V. to be transported to the hospital for medical care for herself and L.G.V. Although L.V. protested, she and L.G.V. were eventually taken to the hospital and law enforcement reported their concerns to Child Protective Services. At the hospital, both L.V. and L.G.V. tested positive for methamphetamines. L.V. admitted that she used methamphetamines but stated that they had been prescribed to her by a doctor to

treat cancer. While in the hospital, L.V. met with a mental health crisis responder and agreed to medical treatment for a pregnancy-related condition before leaving the hospital. She also visited with L.G.V. several times while hospitalized and was alert, oriented, and asked appropriate questions regarding the child's care. When L.V. was discharged, L.G.V. remained in the hospital. On July 6, the Department of Children, Youth, and Families (DCYF) had a meeting over the phone with L.V. wherein she stated that she had some items for L.G.V. but that she did not have a car seat or sleeping items. During the call, the staff of the shelter where L.V. lived established that she would not be permitted to have L.G.V. there because the shelter had residents in active drug use and experiencing mental health concerns. At some point during the meeting, L.V. hung up the phone and did not respond either time DCYF called her back.

On July 7, 2021, the King County Superior Court entered a shelter care hearing order (SCHO) that found, in pertinent part, that the "[s]pecific services offered or provided to the parent(s) have been unable to remedy the unsafe conditions in the home and make it possible for the child to return home." The SCHO noted that DCYF recommended that L.V. complete a psychological evaluation with a parenting component, a chemical dependency assessment and random urinalyses upon request, and attend parenting classes. The court ordered that L.G.V. be placed in licensed foster care and that L.V. be permitted three visits with him per week for three hours each visit, supervised by DCYF, which would change to monitored visits if three consecutive weeks of visits were completed

without safety concerns. L.V. attended every visit and behaved calmly and affectionately with L.G.V.

In late July, 2021, in two separate visits, L.V. attempted to leave with L.G.V. and expressed that she thought the case had been dismissed. She subsequently created motions from unrelated DCYF templates available online and sent them to various people at DCYF, including her assigned social worker. On August 4, the court held a 30-day shelter care hearing and considered the emergency motion DCYF had filed to suspend L.V.'s visitation. L.V. insisted that she had filed motions and the case had been dismissed. The court suspended L.V.'s visitation until she demonstrated progress in her mental health services and understood the nature of DCYF's involvement and the corresponding dependency proceeding. The court also found that L.V. currently demonstrated that she did not understand the proceedings, determined she was incompetent, and appointed a guardian ad litem (GAL) for her. Subsequently, on September 10, the GAL moved for instructions regarding her authority and contested the court's determination that there were any concerns about L.V.'s competency. A competency hearing was scheduled for September 29, but L.V. did not appear for it.

On December 1, 2021, the social worker assigned to L.V. found her living in a tent in Seattle. L.V. expressed a desire to see L.G.V. and the social worker advised her that the court order required participation in mental health services before visitation would resume. L.V. declined mental health services and corresponding assistance with transportation and housing, as well as offers of a cell phone and gift cards. The social worker returned to L.V.'s residence again on

January 3, 2022, accompanied by the court appointed special advocate (CASA) assigned to the case. L.V. again declined the cell phone that the social worker offered and said that she did not want to discuss the ordered services, but did accept a letter that provided the contact information for her attorney and the GAL, as well as instructions for how to participate in the court-ordered services.

From January 10 through 13, a dependency trial was conducted. L.V.'s attorney and GAL attended but L.V. did not. The court found that L.V. had previously been offered services to address her mental health, substance use, and parenting skills. It also specified that, pursuant to RCW 13.34.130, the services ordered were a psychological evaluation with a parenting component, a drug and alcohol evaluation, weekly random urinalyses, evidence-based in-home service upon reunification, mental health treatment, and cooperation to establish paternity—the same services as those listed in the SCHO with minor additions.

On April 11, May 12, June 15 and 22, 2022, a social worker went to where L.V. was residing and provided her with both verbal and written information on how to access the services that had been ordered for her, including offers of transportation. Each time, L.V. either refused to interact with them or would speak with the social worker but decline services. On June 8, 2022, DCYF filed a petition to terminate parental rights to L.G.V.

Trial was held on May 23 and 24, 2023 and L.V. did not appear. The court found that DCYF had proven the elements required to terminate parental rights under RCW 13.34.180(1)(a)-(f) by clear, cogent, and convincing evidence. Specifically, it found that "[t]he services offered under RCW 13.34.136 have been

expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies with[in] the foreseeable future have been expressly and understandably offered or provided" and provided a list of findings for each recommended service." The court concluded that there was little likelihood that conditions would be remedied for L.G.V. to return to L.V. and that the continuation of the relationship between them diminished L.G.V.'s prospects for integration into a stable and permanent home. It granted the petition and terminated L.V.'s parental rights to L.G.V.

L.V. timely appealed.

ANALYSIS

Parents have a fundamental right to the care and custody of their children and a court "may not terminate a parent's rights without showing that the parent is currently unfit to parent the child in question." *In re Parental Rts. to B.P.*, 186 Wn.2d 292, 312-13, 376 P.3d 350 (2016). Terminating parental rights without making such a finding violates due process protections. *Id*.; *see* WASH. CONST., art. I, § 12. In Washington, the termination of parental rights is a two-step process. *In re Welfare of A.B.,* 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). "The first step focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence." *Id.* (footnote omitted). That standard is satisfied when a court determines that the ultimate fact at issue is shown to be 'highly probable.'" *In re Dep. of J.D.P.,* 17 Wn. App. 2d 744, 754, 487 P.3d 960 (2021) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). The second step evaluates the best interests of the child and need be proved by only a

preponderance of the evidence. *A.B.*, 168 Wn.2d at 911. L.V. challenges only the first step.

The statutory scheme provides that termination may be ordered when the six statutory elements of RCW 13.34.180(1)(a)-(1)(f) are shown by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). L.V. assigns error only to statutory element (d) which provides that "the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." This court reviews the termination of parental rights by considering "'whether substantial evidence supports the trial court's finding of fact by clear, cogent, and convincing evidence.'" *In re Dep. of A.N.C.,* 24 Wn. App. 2d 408, 414, 520 P.3d 500 (2022) (quoting *In re Parental Rights of K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016)). We defer to the trial court's determinations of credibility because termination proceedings are highly fact-specific. *Id.*

I.      Simultaneous Services Offered

L.V. asserts that DCYF did not offer the necessary treatment required by the statute for her concurrent mental health and chemical dependency conditions. A service is considered necessary if it is required to address a condition that prevents reunification of the parent and child. *A.M.M.*, 182 Wn. App. at 793. Accordingly, services must be tailored to the particular parent's needs and circumstances. *A.N.C.*, 24 Wn. App. 2d at 416. However, if a parent is unwilling or unable to participate in the services DCYF provides, DCYF is not required to

continue offering more services that might be helpful. *In re Dep. of T.R.*, 108 Wn. App. 149, 163, 29 P.3d 1275 (2001).

Although DCYF recommended both psychological and substance abuse services to her, L.V. avers that integrated services must be offered when mental health coincides with chemical dependency. She cites *In re Welfare of S.J.*, 162 Wn. App. 873, 256 P.3d 470 (2011) to support this assertion. In that case, DCYF required the parent to complete chemical dependency treatment prior to receiving mental health treatment. *S.J.*, 162 Wn. App. at 881-82. This court concluded that requiring the parent to wait for the mental health services inhibited their ability to participate in the other required programs and recommendations and, as a result, all necessary services had not been provided. *Id.* at 884. The crux of the analysis in *S.J.* is not that multiple issues had to be addressed in a single treatment, as L.V. suggests, but that, in the circumstances presented there, the requirement of a particular *order* of treatment was inappropriate. *See id.* *S.J.* does not control here because DCYF presented services to L.V. simultaneously and did not require, or even recommend, any particular sequence of completion.

At the termination trial, the court noted particular findings regarding DCYF's efforts to engage L.V. in mental health services. It found that DCYF had set an appointment for L.V. to complete the evaluation and she did not attend, that L.V. declined DCYF's offer of transportation to the appointment, and that "the mother never expressed any confusion or barriers to completing this service," but that she never completed it nonetheless. It also considered that, although mental health likely played a role in L.V. declining the help that was offered to her, DCYF social

workers and the CASA "went a remarkable number of times" to attempt to engage L.V. in the offered services. The trial court concluded that, although more could have been done, DCYF has finite resources and "[DCYF] did everything that was reasonable in [these] circumstance[s] to reach out to the mother and give her an opportunity to reengage." There is substantial evidence to support the trial court's finding that DCYF provided the necessary services to L.V. and she does not provide controlling authority to support her claim that a particular combination or kind of treatment was required to be offered.

II.     Understandable Offer of Tailored Services

L.V. also argues that DCYF did not "understandably" offer the services because it was aware that she could not comprehend them. In cases where DCYF has reason to believe that a parent has an intellectual disability, it is required to determine whether the parent does in fact have a disability and, if they do, how the disability could impact the parent's ability to understand the offer of services. *In re Parental Rts. to M.A.S.C.*, 197 Wn.2d 685, 689, 486 P.3d 886 (2021). "DCYF must *then* tailor its offer of services in accordance with current professional guidelines to ensure that the offer is reasonably understandable to the parent." *Id*. (emphasis added).

In *M.A.S.C.*, our state Supreme Court concluded that DCYF had reason to know that the mother might have an intellectual disability because it had access to child welfare reports from Oregon that suggested a possible disability and the agreed upon facts recognized the mother's cognitive difficulties. *Id*. at 700-01. Despite these indications of a disability, DCYF did not obtain a diagnosis or

determine the extent of any potential disability and, thus, the court concluded that the necessary services according to the parent's particular needs could not be determined or offered. *Id.* at 701-02. In contrast here, DCYF has not had reason to believe that L.V. has a cognitive or intellectual disability. In fact, the record establishes that she communicated clearly on several occasions, including when she and L.G.V. were in the hospital just after L.G.V.'s birth and through written e-mails to DCYF regarding the case. Although she also demonstrated confusion at particular times during the proceedings, DCYF did not have reason to know that L.V. has an intellectual disability that requires a particular form of communication. Mental health conditions are not equivalent to intellectual disabilities and our state Supreme Court has only required particular steps be followed for the latter. *Id.* at 688-89 n.2 ("Mental illness is distinct from both intellectual and developmental disabilities."). Further and most critically, L.V. has refused to participate in the evaluations DCYF offered that are designed to determine her specific mental health needs. L.V. argues that DCYF was required to ensure that services were "reasonably understandable" based on professional guidelines regarding her disability, but there is substantial evidence to support the trial court's finding that DCYF had no reason to believe that L.V. had an intellectual disability. Other than those pertaining to intellectual disability where conclusive diagnostic information was either available or indicated as necessary, L.V. provides no authority that particular communications or assessments must be made when the mental health of a parent is in question.

III.     Futility

Finally, we conclude that there is substantial evidence that the offer of additional services would have been futile in these circumstances. "Where the record establishes that the offer of services would be futile, the trial court can make a finding that [DCYF] has offered all reasonable services." *In re Welfare of M.R.H.,* 145 Wn. App. 10, 25, 188 P.3d 510 (2008). Services are futile if a parent is either unwilling or unable to participate in the reasonably available services DCYF has provided to them. *In re Parental Rts. to K.M.M.,* 186 Wn.2d 466, 483, 379 P.3d 75 (2016). Not only did L.V. decline to participate in the services that DCYF offered, but since October 2022, she was unresponsive to communication from DCYF in e-mails, at known phone numbers, and through messages on social media. DCYF was also unable to locate her through a resource called "Parent Locator" which searches databases for parent contact information. In light of L.V.'s history of refusing to participate in the services DCYF required for reunification, the court's finding that it was unlikely L.V. would utilize the offer of further services was proper.

Affirmed.

Hazelrigg, ACJ

WE CONCUR:

Birk, J.                    Coburn, J.